[No. A122626. First Dist., Div. Two. Oct. 22, 2009.]

WELLS FARGO BANK et al., Plaintiffs and Respondents, v.
JAMES NEILSEN, Defendant and Appellant.

COUNSEL

Law Office of Benjamin R. Levinson and Benjamin R. Levinson for Defendant and Appellant.

Alpert, Barr & Grant, Gary L. Barr and Mark S. Blackman for Plaintiff and Respondent Wells Fargo Bank.

Barrett Daffin Frappier Treder & Weiss and Edward A. Treder for Plaintiff and Respondent PHH Mortgage Corporation.

Curtis Law Group, Robert J. Curtis and Kristen C. Lu for Plaintiff and Respondent Robert J. Curtis.

OPINION

**HAERLE, Acting P. J.—**

## I. INTRODUCTION

Appellant is the former owner of a residence located at 1725 Van Buren Street in San Mateo. Respondents Wells Fargo Bank (WFB) and PHH Mortgage Corporation (PHH) are two of the former three holders of deeds of trust on that property. Respondent Robert Curtis, an attorney, was the foreclosure trustee for the property, which was sold at public auction in March 2007 to WFB. Subsequent to that sale and the payment of the sum owing to the third lienholder, a dispute arose as to the proper allocation of the remaining funds, some $368,000. Appellant claimed that most of those funds should be distributed to him, but respondent lienholders disagreed. Respondent Curtis accordingly filed a petition for instructions to determine the priority of the liens in the San Mateo County Superior Court. The trial court determined that the remaining funds were properly allocated to the other two lienholders, a determination which left nothing for appellant. He appeals, claiming (1) he was entitled to those funds and (2) respondent Curtis was not entitled to his attorney fees and costs. We disagree with both contentions and thus affirm judgment of the trial court.

## II. FACTUAL AND PROCEDURAL BACKGROUND

As of March 2007, there were three deeds of trust on appellant's property. The first in point of time was to secure a loan of $100,000 payable to American Express Centurion Bank (AMEX) and recorded in January 2002; as

of March 2007, the sum of $28,726 was owed on it. The second in point of time was to secure a loan of $75,000 payable to WFB and recorded in September 2002; as of March 2007, the sum of $78,433 was owed on it. The third was a deed of trust recorded in November 2003 to secure a loan made by PHH in the amount of $322,700; as of March 2007, the sum of $322,000 was payable on it.[1]

As a part of the PHH loan transaction in November 2003, AMEX expressly subordinated its lien to the PHH obligation but, importantly, *did not* subordinate its loan to the WFB obligation. Additionally, WFB was not a party to the subordination agreement between AMEX and PHH and, thus, never consented to subordinate its second priority lien to the PHH mortgage lien.[2] As a result, an inconsistent status of liens resulted, i.e., the third lien in point of time, the PHH mortgage lien, became senior to the AMEX lien yet remained junior to the WFB lien, and the first lien in point of time, i.e., the AMEX lien, became junior to the third lien, the PHH lien, but remained senior to the WFB lien.

On March 19, 2007, a foreclosure sale was held on the property. WFB purchased the property for $400,000 at that sale; it did so, apparently, to protect its own economic interest since it now held a subordinate lien possibly subject to elimination. The debt then owing AMEX (as noted,

---

[1] By a petition for rehearing and accompanying request for judicial notice, appellant attempted to change these facts from those just recited, and also recited in his original briefs to us. In the later filings, he belatedly contended that there was an earlier, i.e., December 2001, loan of $275,000 made to him by PHH and that, as a consequence, the date of *that* loan is the date which controls as to the relative seniority of lienholder PHH. We reject this contention because (1) it was and is waived by appellant's failure to make such an argument, or even note the December 2001 PHH loan, either in the court below or in his briefs to us and (2) because, clearly, the operative date of the relevant PHH loan is the effective date of the loan which was in effect as of November 2003, the date of the subordination agreement, and that was the PHH loan of $322,700, which became effective on or about the same date as that agreement.

[2] The subordination agreement itself was not included in the record originally provided us, nor was it apparently ever before the trial court. We asked for a copy of it, however, received it, and then took judicial notice of it pursuant to Evidence Code section 452. (See *Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1117–1118 [62 Cal.Rptr.3d 59].) Having done so, we were (and actually remain) rather perplexed regarding several aspects of it, including how the parties described it in their original briefs to us. For example, appellant was clearly not a party to it, contrary to respondent WFB's brief to us. More importantly, neither was respondent PHH, although via a supplemental letter brief to us it contends it had a "private label partnership agreement with AMEX" which effectively put it into the position the parties agree it occupied relative to the other lienholders. Finally, the subordination agreement was apparently signed by only one corporate party, and possibly the wrong one to boot. Notwithstanding all these problems, no party, including specifically appellant, has asked us to remand this case to the trial court for further findings on this subject, or otherwise contends that the apparent poor drafting of and other problems with the subordination agreement render it ineffective to accomplish what it apparently sought to accomplish, much less render it invalid.

$28,726) was paid from those funds, leaving a little over $371,000 left over. After the deduction of trustee fees and expenses, this sum was reduced to approximately $368,000.

Appellant, the homeowner, contended that, after the approximately $78,000 owing to WFB was paid, the balance of the "surplus funds" belonged to him, whereas lienholder PHH contended that its loan should be paid off from those funds. Respondent Curtis, the foreclosure trustee designated by AMEX, was uncertain as to how to resolve this dispute and so, on August 16, 2007, he filed a "Petition and Declaration Regarding Unresolved Claims and Deposit of Undistributed Surplus Proceeds" in San Mateo County Superior Court, pursuant to Civil Code section 2924j, subdivision (c).[3] Curtis's office served copies of this petition on appellant and respondents WFB and PHH.[4]

The petition was assigned to Superior Court Judge Steven Dylina. On March 7, 2008, he issued a minute order requiring PHH to file a memorandum in support of its position regarding its entitlement to any surplus funds, and then asked all parties to file legal memoranda regarding whether the case of *Bratcher v. Buckner* (2001) 90 Cal.App.4th 1177 [109 Cal.Rptr.2d 534] (*Bratcher*) was controlling regarding how such surplus funds should be distributed in a case such as this. Such memoranda were filed and a hearing on the legal issue held on March 28, 2008. At the conclusion of that hearing, the court held that *Bratcher* was, indeed, dispositive of the issue before it, and hence barred appellant from recovering any of the surplus funds. Subsequently, the two remaining unpaid lenders, respondents WFB and PHH, stipulated regarding both the distribution of the remaining surplus funds and the payment of attorney fees and costs to respondent and trustee Curtis. A judgment consistent with the court's verbal ruling of March 28 and that stipulation was filed on July 9, 2008.

Appellant filed a timely notice of appeal the following month.

## III. DISCUSSION

Clearly, and as the parties agree in their briefs to us, the issue before us is purely and simply a legal one, and our standard of review de novo. But, as

---

[3] There is some confusion in the record as to who the "trustee" under the first, i.e., AMEX, deed of trust was. The first page of the petition filed on August 16, 2007, identifies the petitioner as "Apricia Lender Services," but subsequent material in the record appears to confirm that respondent Curtis was the trustee under the AMEX deed of trust and hence the proper petitioner.

[4] There is also confusion in the record as to whether trustee Curtis in fact served lienholder PHH with this document. However, this uncertainty is not relevant because PHH ultimately appeared, filed briefs, and argued before the trial court; it has also filed a respondent's brief with this court.

the trial court aptly observed during the course of its March 28, 2008, hearing, the legal issue presented in this case involves an "abstract and obtuse area of the law." Reduced to the simplest description we can fashion, it is: did the failure of the three lenders to make clear the relative priority of all three liens at the time of the 2003 subordination agreement mean that, as a matter of law, appellant is entitled to most of the funds left over from the foreclosure sale, and one of the three lenders/respondents (PHH) entitled to only a continuing lien on the real property? We agree with the trial court that the answer to this question is in the negative, and that it is appellant who is entitled to none of the so-called "surplus funds."

Appellant makes essentially these arguments in favor of reversal: (1) the statutory system applicable in a case such as this was and is Civil Code section 2924 et seq.,[5] i.e., the statutes governing nonjudicial foreclosure sales of real property, and *not* Code of Civil Procedure section 704.760 et seq., the statutes governing the enforcement of liens on real property via judicially enforced foreclosure (the statutes implicated in *Bratcher*); (2) section 2924 et seq. apply to "voluntary" lien cases, such as this case, whereas the Code of Civil Procedure sections involved in *Bratcher* involved involuntary liens; (3) thus, the trial court was wrong to apply the "circuity of liens" concept discussed and applied in *Bratcher* to a nonjudicial foreclosure of voluntary liens such as was involved here; (4) the *Bratcher* court relied substantially on a decision of the Texas Supreme Court, *ITT Diversified Credit v. First City Corp.* (Tex. 1987) 737 S.W.2d 803 (*ITT*), but that case dealt with enforcement of liens on personalty under Texas statutes identical with sections 1102 and 9316 of California's Commercial Code, statutes which deal exclusively with liens on personalty, not realty; (5) trustee and respondent Curtis was wrong in filing the petition for instructions because the whole matter could and should have been resolved under section 2924 et seq.; and (6) thus, the trial court erred in awarding Curtis's law firm its claimed fees and costs.

Respondents counter that (1) because of the failure of PHH and AMEX to deal with the relative priority of the PHH and WFB liens in their 2003 subordination agreement, that agreement was incomplete, and created a manifest inconsistency in the priority of liens applicable to this real property; (2) this inconsistency can and should be dealt with via the "circuity of liens" doctrine applied in *Bratcher* and cases relied on in that decision, including the *ITT* case; (3) section 2924 et seq. *do not* deal with the subject of inconsistent lien status and especially not the priority of real property liens when there is, as there was here, an insufficient subordination agreement; thus it is imperative for a court to adapt and apply a rule of law to such cases; (4) the rule applied by the *Bratcher* court makes perfect sense in the present context, even if the facts there were slightly different; (5) e.g., the fact that

---

[5] All further statutory references are to the Civil Code, unless otherwise noted.

this case involved three voluntary liens and the *Bratcher* case involved a combination of voluntary and involuntary liens is irrelevant, as is the fact that this case, unlike *Bratcher*, involved a nonjudicial foreclosure; and (6) if appellant prevails on his appeal, he would effectively get a windfall, as he would receive over $300,000 of "surplus funds" and one of the three lienholders on his property (i.e., PHH) would have only a continuing lien on the property after the foreclosure sale.

We agree with the trial court's resolution of these issues and thus rule in respondents' favor. In so doing, we start with the same statute the *Bratcher* court started with in its analysis, section 2897: "Other things being equal, different liens upon the same property have priority according to the time of their creation . . . ."

But, of course, "other things" are not "equal" when there is, as here, a later subordination agreement. As the *Bratcher* court explained, such an agreement is one "whereby a party agrees to subordinate the priority of his or her lien to another" and the court quoted Black's Law Dictionary for the definition of "subordination" as " '[T]he act or process by which a person's rights or claims are ranked below those of others; e.g. a second mortgagee's rights are subordinate to those of the first mortgagee.' " (*Bratcher, supra*, 90 Cal.App.4th at p. 1185, italics omitted, quoting Black's Law Dict. (6th ed. 1990) p. 1426, col. 1; see also 5 Miller & Starr, Cal. Real Estate (3d ed. 2009) § 11:200 et seq., p. 11-672.) As the *Bratcher* court noted, citing a decision by Division Four of this court, such agreements "must be interpreted to enforce the objective intent of the parties." (*Bratcher, supra*, 90 Cal.App.4th at p. 1186, citing *Klingele v. Engelman* (1987) 192 Cal.App.3d 1482, 1485 [238 Cal.Rptr. 199].)

The parties agree that a deed of trust and the subordination agreement were executed on November 11, 2003, and recorded in the San Mateo County Recorder's office on November 26, 2003. The PHH deed of trust imposed a new and large lien on the property—over $322,000. The parties to the subordination agreement were PHH and AMEX. By it, AMEX agreed to subordinate its 2002 (originally the first) lien to the PHH lien. In so doing, according to WFB—the creditor left out of the 2003 transaction—the parties made what WFB argued to the trial court was a "highly unorthodox move." This is so because, absent the subordination agreement, the priority of the parties was, as specified by section 2897, in chronological order, i.e.: AMEX, WFB and then PHH. But, as a result of that agreement, PHH's lien became superior to the first 2002 lien, i.e., that of AMEX. But, because WFB was not a party to the subordination agreement, its 2002 lien continued to have priority over PHH's 2003 lien. Similarly, AMEX's lien became, per the subordination agreement, junior to PHH's 2003 lien, but remained senior to

WFB's second lien. The *Bratcher* court, and the court below, referred to this confusing circumstance as "circuity of liens." (See *Bratcher, supra*, 90 Cal.App.4th at pp. 1185–1186.) A more understandable, albeit wordier, way of describing it is an inconsistency regarding the priority of real property liens created by successive deeds of trust plus an intervening and incomplete subordination agreement.

A California real estate text cited in *Bratcher* discusses this situation in the context of real estate loans as follows: " 'A first-rate legal puzzle arises when, by agreement or otherwise, a superior mortgage is subordinated to another mortgage that is subject to intervening liens to which the subordinated superior lien is otherwise paramount. Circuity of lien results because the prior mortgage is displaced by the subordinating lien while apparently retaining its priority over the intervening liens. Thus, a situation is created in which each is simultaneously prior and subordinate to the other. To illustrate, an admittedly first and prior purchase-money mortgage on clear and vacant land is subordinated by express agreement to a later mortgage given to secure a construction loan. The loan is not recorded, however, until construction begins, thus automatically preferring mechanics' liens. The purchase-money mortgage is then subordinate to the construction loan but prior to mechanics' liens; the construction loan is prior to the purchase-money mortgage but subordinate to mechanics' liens; and the mechanics' liens are prior to the construction loan but subordinate to the purchase-money mortgage.' " (*Bratcher, supra*, 90 Cal.App.4th at pp. 1185–1186, quoting 2 Bowman, Ogden's Revised Cal. Real Property Law (Cont.Ed.Bar 1975) Mortgages and Trust Deeds, § 17.36, p. 919.)

As noted above, after the subordination agreement, the order of priority of the three lenders' liens was, clearly, inconsistent: per that agreement, PHH was superior to AMEX but still junior to WFB, whereas AMEX was junior to PHH, but still senior to WFB. As a result, and following the holding of the *Bratcher* court, the trial court ruled that from the $367,495.43 of "surplus funds" deposited by trustee Curtis with the court, $15,385.77 would be paid to his office for trustee fees and expenses, and the balance distributed as follows: to WFB $78,433.07 and to PHH $273,856.59. This apparently left lienholder PHH over $48,000 short of the amount owed to it, and it also left nothing to be paid to the trustor, i.e., appellant.

To explain the result and its bases further, we will quote the holding of *Bratcher* but substitute in place of that court's hypothetical parties "A, B and C" the parties here and the results thus applicable to them: " 'Thus, [PHH] by virtue of the subordination agreement, is paid first, but only to the amount of [AMEX's] claim, to which [WFB] was in any event junior. [WFB] receives what it expected to receive, the fund less [AMEX's] prior claim. If

[AMEX'S] claim is smaller than [PHH's], [PHH] will collect the balance of its claim, in its own right, only after [WFB] has been paid in full. [AMEX], the subordinator, receives nothing until [WFB and PHH] have been paid except to the extent that its claim, entitled to first priority, exceeds the amount of [PHH's] claim, which, under its agreement, is to be first paid.' " (*Bratcher, supra*, 90 Cal.App.4th at p. 1187.)[6]

Appellant objects to this result, arguing that, because what was involved here was a nonjudicial foreclosure initiated under section 2924 et seq., rather than a judicial foreclosure such as was involved in *Bratcher*, the logic of and legal authorities cited in that case are not applicable here. The provisions of section 2924 et seq. are, he contends, so comprehensive that, in interpreting and applying them, there is no need to import legal authority such as *Bratcher* arising under and applying different statutes (there, the judicial foreclosure provisions of the Code Civ. Proc.).

Appellant argues that, after the foreclosure sale, respondent WFB could have and should have received the balance payable on its outstanding loan, i.e., about $78,000, but no more, and that the original third lienholder in terms of chronology, PHH, should not have been allowed to receive any of the surplus funds but, rather, should have been left with its lien on the property. Thus, per appellant, the "buyer at the foreclosure sale of the Amex loan took title to the Property subject to the PHH senior deed of trust."

Appellant also argues that the priorities to be utilized in disposing of funds secured in a sale where the property is subject to multiple liens is adequately dealt with via section 2924k, subdivision (a), and that the application of the "circuity" system used in *Bratcher* in the context of nonjudicial foreclosures would necessarily have the effect of "chilling" the bidding process and thus disadvantaging trustors such as himself.

█ We disagree with these arguments for a number of reasons. In the first place, nothing in *Bratcher* limits its reasoning regarding the solution to a "circuity of liens" problem to nonvoluntary liens, i.e., to the sort of enforcement of judgment process involved in that case. Second, *Bratcher* did indeed involve voluntary liens: there were two such on the property involved there.

---

[6] A recent decision of the Arizona Supreme Court cites and relies on the reasoning of *Bratcher* in the context of a real estate foreclosure sale. (See *In re Price Waterhouse Ltd.* (2002) 202 Ariz. 397 [46 P.3d 408, 410–411] (*Price Waterhouse*).) In so doing, it characterizes *Bratcher* and other similar out-of-state cases as "partial subordination" holdings as opposed to other authorities, which it labels "complete subordination" cases. (*Ibid.*; see also Misken, *Complete vs. Partial Subordination: Avoiding Surprises in Circular Priorities of Claims* (July 1, 2007) 26-6 American Bankruptcy Institute J. 18; Nation, *Circuity of Liens Arising From Subordination Agreements: Comforting Unanimity No More* (2003) 83 B.U. L.Rev. 591, 599 et seq., an article to be discussed further *post*.)

Third, appellant's argument that, because it involved personal property, the *ITT* decision of the Texas Supreme Court is not relevant here is also unpersuasive. As the *Bratcher* court noted: "For purposes of application of subordination agreements to lien priority, there is 'no valid basis for [a] distinction . . . between real property and personalty.' " (*Bratcher, supra*, 90 Cal.App.4th at p. 1188; see also *Pacific Loan Management Corp. v. Superior Court* (1987) 196 Cal.App.3d 1485, 1494, fn. 2 [242 Cal.Rptr. 547].) To the same effect is a recent law review article on the subject of lien subordination and the sometimes resulting confusion regarding priorities; it urges that "there is no reason to limit the *ITT* holding to non-real estate transactions." (Nation, *supra*, 83 B.U. L.Rev. at p. 599, fn. 61; see also *Duraflex Sales & Service Corp. v. W.H.E. Mech. Contractors* (2d Cir. 1997) 110 F.3d 927, 936.)

Fourth, and most importantly, the Civil Code provisions appellant argues are applicable here (indeed, per him, totally controlling), i.e., section 2924 et seq., *do not* specify how a court with which funds from a foreclosure sale are deposited should resolve the sort of inconsistent priority situation posited here.

We thus agree with respondents WFB and PHH that there needs to be a rule for deciding on the priority of real property liens when an inadequate and/or incomplete subordination agreement creates an apparent inconsistency as regards priorities, and that there is no reason why that rule needs to be, or should be, different when the foreclosure process involves, as it did here, entirely voluntary liens and, thus, the nonjudicial foreclosure process dictated by section 2924 et seq. versus when it involves the judicial foreclosure process set forth in the Code of Civil Procedure. Indeed, as respondent WFB contends in its brief to us, such a consistency in the prioritization process will clearly help, not hurt (as appellant argues in his brief), the nonjudicial foreclosure process.

■ Section 2924 et seq. address the subject of nonjudicial foreclosures on real property, the process undertaken by a lienholder (here, AMEX). As one of our sister courts summarized those statutes recently: " '[S]ections 2924 through 2924k provide a comprehensive framework for the regulation of a nonjudicial foreclosure sale pursuant to a power of sale contained in a deed of trust.' [Citations.] This comprehensive statutory scheme has three purposes: ' "(1) to provide the creditor/beneficiary with a quick, inexpensive and efficient remedy against a defaulting debtor/trustor; (2) to protect the debtor/trustor from wrongful loss of the property; and (3) to ensure that a properly conducted sale is final between the parties and conclusive as to a bona fide purchaser." [Citations.]' [Citation.] [¶] The manner in which the sale must be conducted is governed by section 2924g, subdivision (a), which

requires, inter alia, that the property be sold at public auction to the highest bidder in the county where the property is located. 'As a general rule, the purchaser at a nonjudicial foreclosure sale receives title under a trustee's deed free and clear of any right, title or interest of the trustor. [Citation.] A properly conducted nonjudicial foreclosure sale constitutes a final adjudication of the rights of the borrower and lender.' " (*Melendrez v. D & I Investment, Inc.* (2005) 127 Cal.App.4th 1238, 1249–1250 [26 Cal.Rptr.3d 413]; see also *Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830–832 [30 Cal.Rptr.2d 777]; *Strutt v. Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 877 [105 Cal.Rptr. 395]; 4 Witkin, Summary of Cal. Law (10th ed. 2005) Security Transactions in Real Property, § 144 et seq., p. 943, especially §§ 162 & 163; 4 Miller & Starr, Cal. Real Estate (3d ed. 1989) § 10:181 et seq., especially § 10:213.)

■ Sections 2924j and 2924k are the relevant provisions regarding the disposition of the proceeds of a foreclosure sale of the sort conducted here. Section 2924h provides that, after a nonjudicial foreclosure sale, where there are proceeds remaining after the payment of (a) the costs and expenses of the sale, including trustee fees and attorney fees (see § 2924k, subd. (a)(1)) and (b) the obligation secured by the deed of trust or mortgage which was the subject of the sale—here, the balance of the AMEX loan (see § 2924k, subd. (a)(2))—"the trustee shall send written notice to all persons with recorded interests in the real property . . . ." (§ 2924j, subd. (a).) Thereafter, after timely claims are received by the trustee (here, Curtis), he "shall exercise due diligence to determine the priority of the written claims received" by him, failing which the trustee must "deposit the funds with the clerk of the court" who, in turn, "shall deposit the amount with the county treasurer." (§ 2924j, subds. (b), (c).)[7] ■ And a later subdivision provides that the trustee has exercised "due diligence" when he or she has "researched the written claims submitted or other evidence of conflicts and determined that a conflict of priorities exists between two or more claimants which the trustee is unable to resolve." (§ 2924j, subd. (f).)

When, as here, that situation obtains, the matter passes to the court to decide. (See §§ 2924j, subd. (d) & 2924k.) Section 2924k requires the clerk of the court to distribute the proceeds from the sale pursuant to an order of the court with, as noted above, first priority being given to the trustee's fees and costs and second priority to the payment of the lien which is the subject of the trustee's sale, here, of course, the AMEX loan. Then this critical subdivision defines the third priority of disposition of the funds: "To satisfy

---

[7] Notably, the first of those subdivisions ends with this pregnant sentence: "Nothing in this section shall preclude any person from pursuing other remedies or claims as to surplus proceeds." (§ 2924j, subd. (b).)

the outstanding balance of obligations secured by any junior liens or encumbrances *in the order of their priority*." (§ 2924k, subd. (a)(3), italics added; see also *Caito v. United California Bank* (1978) 20 Cal.3d 694, 701 [144 Cal.Rptr. 751, 576 P.2d 466]; *Cal-Western Reconveyance Corp. v. Reed* (2007) 152 Cal.App.4th 1308, 1317 [62 Cal.Rptr.3d 244].)

Exactly that was done here. The problem, of course, was that—contrary to appellant's argument—there was and is nothing in sections 2924j or 2924k telling either the trustee or the superior court with which the funds were deposited how to determine the "order of . . . priority" of real estate liens when some of the parties executed a subordination agreement which resulted in an inconsistency in those priorities. Put another way, there is nothing in those otherwise "comprehensive" statutes at all instructive as to how the foreclosure trustee or a court should handle a situation where, as here, the last lien claimant in point of time (here, PHH) obtains a subordination agreement from one, but not both, of the previously senior lienholders. Nor, apparently, is there any judicial interpretation of those provisions which directs a California court how to determine priorities in such a situation. (See, e.g., 4 Miller & Starr, Cal. Real Estate, *supra*, § 10:213, and cases cited therein.)

Precisely that fact situation was presented to the trial court here. In our view, the lack of any express direction in the relevant statutes regarding how to decide a contested priority issue, and the lack of any judicial precedent pertinent to that issue, made it perfectly permissible for it to rely on California precedent arising under slightly different statutes, i.e., the Code of Civil Procedure provisions governing *judicial* foreclosures on real property.[8]

In fact, when one probes into the matter a bit, it turns out that there is no particular difference between the disposition of "surplus funds" after a judicial foreclosure sale under the relevant Code of Civil Procedure provisions and a nonjudicial foreclosure sale under section 2924 et seq. This is evidenced by the seldom-cited Code of Civil Procedure section 727, a provision applicable to judicial foreclosures. It reads: "If there be surplus money remaining, after payment of the amount due on the mortgage, lien, or incumbrance, with costs, the Court may cause the same to be paid to the person entitled to it, and in the meantime may direct it to be deposited in Court." (Code Civ. Proc., § 727.) Even more interestingly, the only case we have found citing this provision concerning "Priority of liens" (see Notes of Decision, West's Ann. Code Civ. Proc. (1980) foll. § 727, p. 111) turns out to be a case involving a *nonjudicial* foreclosure under section 2924 et seq. (See *Cockerell v. Title Ins. & Trust Co.* (1954) 42 Cal.2d 284, 286 [267 P.2d 16].)

---

[8] Indeed, at oral argument appellant's counsel conceded that there is no authority in California holding to the contrary.

For all these reasons, we reject appellant's contention that the trial court erred in relying on *Bratcher*, a judicial foreclosure case, in a nonjudicial foreclosure case such as the present one. Further, the few authorities citing or discussing *Bratcher* since its publication in 2001 seem to support its relevance notwithstanding the type of foreclosure involved here. Thus, Miller and Starr's text, under an overall heading entitled "AGREEMENTS ALTERING PRIORITIES: 'SUBORDINATION AGREEMENTS,'" describes the holding of *Bratcher* under the subheading "Subordination with multiple liens; potential for circuity of priorities." Those authors do not note—much less stress—that *Bratcher* involved a judicial foreclosure as contrasted with a nonjudicial foreclosure. (5 Miller & Starr, Cal. Real Estate, *supra*, § 11:202, pp. 11-672, 11-680, boldface omitted; see also *id.*, §§ 11:200, 11:201.)

■ A recent decision of the Arizona Supreme Court cited *Bratcher* approvingly in a case apparently involving entirely voluntary liens. That court described the "partial subordination" rationale in such cases thusly: "Partial subordination means that this alteration of the priority of liens between the first and third lienholders has no effect on the second priority lienholder. The shift in priority relates only to the amount of the original third priority lien. If the third priority lien is larger than the original first priority lien, then the original first priority lien moves completely to the third position. The original third priority lien moves into first position *but only to the amount of the original first priority lien*. If the third priority lien is smaller than the original first priority lien, then the difference between the two amounts, *up to the total of the original first priority lien*, is still in a priority position relative to the second priority lienholder. The holder of the second priority lien is neither advantaged nor disadvantaged by the agreement. The second priority lienholder is not a party to the agreement and should not be affected by it. His status remains the same to the extent of any remaining assets available once the amount of the first priority lien has been satisfied. The consequence of a subordination agreement is that the amount of the first lien simply goes toward satisfying in whole or in part two liens as opposed to one." (*Price Waterhouse, supra,* 46 P.3d at pp. 410–411.)

■ A recent law review article, noted above, appeared after the publication of all three of the recent decisions on this complicated issue, i.e., *Bratcher, ITT* and *Price Waterhouse.* In it the author, Professor George Nation III, a professor of Law and Business at Lehigh University, similarly summarizes the "partial subordination" principle applied in those three cases thusly: "Courts that follow the partial subordination approach focus less on the meaning of the word 'subordination' and instead focus on the probable intent of the contracting parties. In addition, these courts often note that the party in the position of the intervening lienholder (*B* in our example) is not usually a party to the subordination agreement. This lack of privity convinces these

courts that the subordination agreement should have no effect, negative or positive, on the intervening lienholder." (Nation, *supra*, 83 B.U. L.Rev. at p. 597.)

Professor Nation then concludes his analysis of all of the cases discussing and ruling on this issue as follows: "Even though *A* and *C* are well advised to avoid the use of the term 'subordination' in favor of other more appropriate terms such as 'intercreditor agreement,' 'assignment,' or 'subrogation,' penalizing them for poor drafting through application of the complete subordination approach is inappropriate. *A* and *C*'s arguably-misleading use of the term 'subordination' harms no one. A court has no reason to overlook the obvious intent of the parties to the subordination agreement, even though the drafting of the agreement may be less than perfect. Moreover, if one focuses only on the relative priority between *A* and *C*, the use of the term 'subordination' is appropriate and consistent with the partial subordination approach. Courts should reject the complete subordination approach and, in cases of circuity resulting from a subordination agreement, apply the partial subordination approach to break the circle." (Nation, *supra*, 83 B.U. L.Rev. at p. 617, fns. omitted.)

Shortly and simply stated, we agree with this analysis, and its application in *Bratcher, ITT* and *Price Waterhouse*.

As noted at the beginning, appellant also appeals from the award of attorney fees and costs in the amount of $15,385.77 to respondent Curtis, the trustee for AMEX who initiated this action in the lower court. We note, first of all, that the statutory provisions appellant insists are solely applicable to this dispute explicitly provide for the payment of such fees. (See § 2924k, subds. (a)(1), (b).) Appellant argues that, because Curtis and his law office allegedly did not deposit the "surplus funds" in an interest-bearing account, as required by the trial court's order of October 16, 2007, the award of fees to his law firm should be vacated. Curtis contends, in his brief to us, that such was in fact done and proffers to this court as evidence of that a declaration of his counsel and attached documents.

We need not decide whether we can or should receive and consider such evidence because our review of the record convinces us that this was not an issue which is properly before us. It is true that, early in the proceedings below (in Sept. 2007), in the course of protesting that the petition filed by trustee Curtis was unnecessary because it was inconsistent with section 2924 et seq., appellant complained that the surplus funds had not been properly deposited. As an apparent result of these contentions, the court issued its October 16, 2007, order requiring that Curtis deposit the "entire

surplus funds with the County of San Mateo" and that such funds "shall be deposited in an interest bearing account to the extent that it can be accomplished."

When, six months later, the key issue of the disposal of the surplus funds was briefed and argued to the trial court, we find nothing in the record indicating that appellant ever again raised the issues of where those funds had been deposited and the reasonableness of trustee Curtis's fees. Clearly, those issues were not mentioned much less contested by appellant, either in his March 21, 2008, brief to that court or at the hearing before it a week later. As a result, the judgment and order appealed from do not even discuss those issues, except to award respondent Curtis his claimed costs. Under the circumstances, we deem the argument waived.

## IV. DISPOSITION

The judgment is affirmed.

Lambden, J., and Richman, J., concurred.

A petition for a rehearing was denied November 10, 2009, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 10, 2010, S178274. Kennard, J., Baxter, J., and Corrigan, J., did not participate therein.