Filed 9/20/24  USS Cal Builders v. San Francisco Bay Area Rapid Transit Dist. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| USS CAL BUILDERS, INC., <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT, <br><br>     Defendant; <br><br> ARCH INSURANCE COMPANY, <br><br>     Intervener and Appellant. | A168102 <br><br> (Alameda County <br> Super. Ct. No. RG20079769) |

Plaintiff USS Cal Builders, Inc. (USS Cal) reached a $1.6 million settlement with defendant San Francisco Bay Area Rapid Transit District (BART) in this action and requested that $1.3 million of the funds be distributed to its counsel pursuant to an attorney lien.  Meanwhile, USS Cal's surety Arch Insurance Company (Arch) had intervened in the action and alleged it was entitled to all of the settlement funds.  Given these competing claims, the parties stipulated that BART would interplead the funds and the trial court would determine their distribution.  The court found USS Cal's counsel had the senior priority lien and ordered $1,338,674.98 disbursed to counsel, with the remaining funds disbursed to Arch.

1

On appeal, Arch argues that (1) the trial court lacked jurisdiction to adjudicate the attorney lien; (2) distribution to USS Cal's counsel was improper because Arch was entitled to the settlement funds; and (3) the attorney lien should not have been enforced because it violates the Rules of Professional Conduct. We disagree and affirm.

BACKGROUND

In 2001, USS Cal executed a fee agreement with Feldman & Associates, Inc. (Feldman) to represent USS Cal "in connection with various construction matters." The agreement provided that, as security for costs, disbursements, and legal services rendered, USS Cal would give and grant Feldman "a first priority attorneys' lien on all claims, causes of action and any amounts received or recovered by you in the above-described matters by way of settlement, judgment or otherwise."

In 2007, USS Cal executed a general indemnity agreement with Arch. The agreement stated that, in the event of a default, USS Cal and its indemnitors "do hereby assign, transfer and set over to Surety, all of their rights under all Bonded Contract(s) including . . . all claims and causes of action against any parties to the Bonded Contract(s)" and "any and all sums due, or to become due under the Bonded Contract(s)." USS Cal executed several other general indemnity agreements with Arch over the next decade, each of which contained similar assignment language. Arch issued numerous bonds to USS Cal, including payment and performance bonds on its contract with BART for Lafayette station site improvements.

In 2018, USS Cal requested financial assistance from Arch in order to pay "critical subcontractors, suppliers and other vendors on the bonded projects." USS Cal and Arch executed a collateral pledge agreement. Paragraph 6.1 of that agreement provided USS Cal and its indemnitors

2

"assign, transfer, convey and set over to SURETY all Project contract funds to be held by SURETY as Collateral Property." The collateral pledge agreement was amended twice. The second amendment executed in January 2019 repeated the language in paragraph 6.1 of the original agreement regarding assignment of project contract funds. But it then added: "With the exception of liens for legal fees and/or of financial institutions — specifically Citizen's Bank — if proven to have a priority over SURETY, or amounts to be paid to subcontractors, suppliers or laborers, such funds include, without limitation, all settlement payments, all payments to satisfy any judgment," and payments related to projects for the South San Francisco Unified School District.

USS Cal filed its complaint against BART in 2020 for breach of contract related to the Lafayette station site improvements. According to USS Cal, settlement negotiations were "nearly complete" when Arch filed its complaint to intervene in June 2022. Arch alleged that, pursuant to the general indemnity agreements, USS Cal had assigned all of its rights in bonded (and unbonded) projects to Arch, including the Lafayette BART station project. Arch also alleged that the second amended collateral pledge agreement was entered into "to protect ARCH from losses related to the project that is the subject of this lawsuit."

USS Cal filed a notice of attorneys' fees lien in August 2022. It stated that USS Cal had a written fee agreement with Feldman in this matter, and that the current outstanding balance owed to Feldman "creates a lien on any proceeds from this matter."

In October 2022, the parties in the action (USS Cal, BART, and Arch) filed a stipulation and proposed order stating they had "agreed to settle and compromise all claims related to defendant BART for payment of the

3

outstanding contract balance and retention plus additional funds for settlement of disputed claims" for a total payment of $1.6 million.

The stipulation identified "competing claims for the settlement funds." It referenced Arch's complaint in intervention, as well as Feldman's "lien claims against any funds received by USS Cal in this Action." Accordingly, the parties sought "to permit BART to interplead the settlement funds and allow the Court to determine the distribution of the settlement funds." The proposed order specified that "[t]his Court shall determine how the Settlement Funds are to be distributed." The trial court entered the order.

USS Cal then moved for a determination that Feldman had an attorneys' fees lien with priority over Arch and was entitled to $1.3 million in settlement funds. The trial court granted the motion in February 2023. As a preliminary matter, it found that Arch had consented by stipulation to the court's jurisdiction to adjudicate the competing claims to the settlement funds.

The trial court then determined that the 2001 fee agreement between USS Cal and Feldman had "expressly created a contractual lien," and that lien was senior to Arch's claimed rights to the funds.[1] The court concluded it would disburse the $1.3 million to Feldman once it "files and serves an itemized billing statement that substantiates the amount listed in the accounts receivable report," and would then disburse the remaining balance of the settlement funds to Arch.

---

[1] Arch complains that the trial court mischaracterized its alleged entitlement to the settlement funds as a "lien" instead of a contractual assignment. We are not persuaded by any argument that this discrepancy demonstrates error, as the trial court's determination of priority was based on seniority in time.

Feldman submitted a declaration with a series of itemized billing statements totaling $1,338,674.98.  On June 15, 2023, the trial court ordered that amount be disbursed to Feldman, with the remaining $261,325.02 of settlement funds disbursed to Arch.  This appeal followed.

## DISCUSSION

I.    *The Trial Court Had Jurisdiction to Adjudicate the Attorney Lien*

Arch argues that the order disbursing settlement funds to Feldman must be reversed because the trial court lacked jurisdiction to adjudicate the attorney lien.  We review this jurisdictional question de novo.  (*Shisler v. Sanfer Sports Cars, Inc.* (2008) 167 Cal.App.4th 1, 6.)

"A lien in favor of an attorney upon the proceeds of a prospective judgment in favor of his client for legal services rendered has been recognized in numerous cases."  (*Cetenko v. United California Bank* (1982) 30 Cal.3d 528, 531.)  "Such a lien may be created either by express contract, as in the present case [citations], or it may be implied if the retainer agreement between the lawyer and client indicates that the former is to look to the judgment for payment of his fee."  (*Ibid.*)

"Unlike a judgment creditor's lien, which is created when the notice of lien is filed (Code Civ. Proc., § 708.410, subd. (b)), an attorney's lien is a 'secret' lien; it is created and the attorney's security interest is protected even without a notice of lien."  (*Carroll v. Interstate Brands Corp.* (2002) 99 Cal.App.4th 1168, 1172.)  "An attorney may, however, choose to file a notice of lien in the underlying action, and the common practice of doing so has been held permissible and even advisable."  (*Ibid.*)

We agree with Arch that, as a general rule, an attorney must bring a separate, independent action to establish and enforce an attorney lien after the client has obtained a judgment.  (*Carroll v. Interstate Brands Corp.*,

5

*supra*, 99 Cal.App.4th at p. 1173.) The trial court in the underlying action "does not lack *fundamental* jurisdiction to adjudicate contractual liens," as it " 'is clearly within the general subject matter jurisdiction of the superior court.' " (*Brown v. Superior Court* (2004) 116 Cal.App.4th 320, 332 (*Brown*), quoting *Lovett v. Carrasco* (1998) 63 Cal.App.4th 48, 54 (*Lovett*).) Instead, the "jurisdictional issue" raised by adjudicating attorney liens in an underlying action is that the court acts in *excess* of its jurisdiction because the attorney is not a party and has no right to intervene. (*Lovett*, at p. 54; see also *Brown*, at p. 328 [explaining that trial court " 'acts in excess of its jurisdiction when it purports to determine whether the attorney is entitled to foreclose a lien on the judgment,' " quoting *Carroll v. Interstate Brands Corp.*, at p. 1173].)

But *Brown* and *Lovett* clarify that there is an exception to this general rule: parties can *allow* the trial court to adjudicate an attorney lien in an underlying action. " 'Unlike some other jurisdictional defects, a party may, by its conduct, be estopped from contesting an action in excess of jurisdiction.' " (*Lovett, supra*, 63 Cal.App.4th at p. 54, quoting *Law Offices of Stanley J. Bell v. Shine, Browne & Diamond* (1995) 36 Cal.App.4th 1011, 1022.) "When the parties to an action allow the trial court to adjudicate a contractual lien in the underlying case without objection, that adjudication— although in excess of the court's jurisdiction—is nonetheless valid." (*Brown, supra*, 116 Cal.App.4th at p. 332.) USS Cal, BART, and Arch stipulated that the trial court would "determine the distribution of the settlement funds." That determination required the trial court to adjudicate the "competing claims" to the funds, including Feldman's attorney lien. Indeed, the stipulation explicitly identified these "lien claims," as well as Arch's complaint in intervention.

6

We reject Arch's arguments that the jurisdictional issue barred the trial court from adjudicating the attorney lien. First, Arch appears to suggest that an attorney lien must always be adjudicated in a separate action and the parties can never agree otherwise. To support its position, Arch only cites cases where there was no such agreement. (*Brown*, *supra*, 116 Cal.App.4th at p. 325 [attorney asserted senior lien in underlying action, but creditor objected to lack of jurisdiction]; *Mojtahedi v. Vargas* (2014) 228 Cal.App.4th 974, 976 [attorney failed to initiate separate action against former clients and instead sued new counsel who obtained settlement payment].) This authority is inapposite. While Arch certainly objected to Feldman's entitlement to the settlement funds, it stipulated to the trial court's adjudication of the lien.

Second, Arch argues that Feldman was not a party to the underlying action and could not make a motion or otherwise "assert" its entitlement to the settlement funds. It was USS Cal, not Feldman, that made the motion to disburse funds to its counsel and the trial court adjudicated Feldman's entitlement to the funds pursuant to the parties' stipulation. (*Brown*, *supra*, 116 Cal.App.4th at p. 332.)

Third, Arch contends that the stipulation was not a "*carte blanche*" agreement to adjudicate the attorney lien. But the terms of the stipulation— to "allow" the court to determine distribution of the funds, with explicit reference to Feldman's attorney lien—clearly evidenced an intent to allow such adjudication. (*Harris v. Spinali Auto Sales, Inc.* (1962) 202 Cal.App.2d 215, 219 ["If interpretation of a stipulation is in order the rules applied are those applied to the interpretation of contracts"]; Civ. Code, § 1636 ["A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful"].)

7

In sum, we conclude that the trial court's adjudication of the attorney lien, although in excess of the court's jurisdiction, was nonetheless valid because of the parties' stipulation. (*Brown*, *supra*, 116 Cal.App.4th at p. 332.)

II.     *No Error in Determination of Lien Priority*

Even if there were no jurisdictional barrier, Arch argues that the trial court still erred in determining that Feldman had the senior priority lien. Appellate courts have applied the de novo standard of review for resolution of lien priority where, as here, the dispositive facts are undisputed. (See, e.g., *Wells Fargo Bank v. Neilsen* (2009) 178 Cal.App.4th 602, 608–609.) While the parties certainly disagree on how USS Cal's agreements with Feldman and Arch should be interpreted, these disagreements present questions of law subject to judicial determination according to the generally accepted canons of contract interpretation. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) Accordingly, we review the ruling de novo.

Arch offers three alternative arguments to support its claim of entitlement to the settlement funds over Feldman. We address, and reject, each argument in turn.

A.     *Priority*

Arch argues first that USS Cal had to prove the seniority of its *own* entitlement as a "necessary prerequisite" for the court's distribution of funds to Feldman. In other words, the trial court "had to necessarily make a finding that USS Cal, and not Arch, had a superior claim to the Settlement Funds."

We reject the premise of this argument that the "sole" question before the trial court was "which of the *parties* to this action, Arch or USS Cal, had a superior claim to the Settlement Funds." Arch again relies on Feldman's

8

status as a non-party to contend that the trial court could not adjudicate its claim to the settlement funds. As detailed above, Arch stipulated otherwise.

The key question before the trial court was whether *Feldman* or *Arch* had priority over the settlement funds. In 2001, USS Cal executed a fee agreement that granted Feldman "a first priority attorneys' lien on all claims, causes of action and any amounts received or recovered by you in the above-described matters by way of settlement, judgment or otherwise." " 'An attorney's lien is created and takes effect at the time the fee agreement is executed.' " (*Brown, supra*, 116 Cal.App.4th at p. 327, quoting *Carroll v. Interstate Brands Corp.*, *supra*, 99 Cal.App.4th at p. 1175.) Attorney liens are afforded priority over subsequently assigned rights. (See, e.g., *Brienza v. Tepper* (1995) 35 Cal.App.4th 1839, 1850 (*Brienza*) [attorney lien accorded priority over assigned right of offset].) The earliest contractual assignment alleged by Arch was in 2007, approximately six years after the fee agreement.

Arch argues that because USS Cal never actually " 'received or recovered' " the settlement funds, the attorney lien was never triggered. We disagree; there is no language in the fee agreement that suggests this phrase should be so limited. USS Cal reached a $1.6 million settlement with BART—pursuant to negotiations commenced before Arch intervened in the action—and thus had " 'received or recovered' " the settlement funds in this action.

Nor is it clear that Arch's alleged assignments even included these settlement funds. The assignment provisions in the general indemnity agreements are silent as to settlement funds, instead identifying "claims and causes of action against any parties to the Bonded Contract(s)" and "any and all sums due, or to become due under the Bonded Contract(s)." The second amended collateral pledge agreement, on the other hand, explicitly identifies

9

"settlement payments," but excludes "liens for legal fees" proven to have a priority over Arch. The language of this second amended collateral pledge agreement, which Arch alleged was entered into "to protect ARCH from losses related to the project that is the subject of this lawsuit," suggests that such funds are not included in the general indemnity agreements. (See Civ. Code, § 1642 ["Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together"].)

Arch then argues that the settlement funds are not subject to the exclusion set out in the second amended collateral pledge agreement because the lien was "unproven" and not senior. Not so. The court first determined that the language of the fee agreement expressly created a lien. Indeed, it noted that neither USS Cal nor Arch had "presented any evidence disputing the authenticity of the submitted retainer agreement." The court then concluded that the lien was valid, and we agree with that conclusion.

Finally, even assuming USS Cal had assigned its rights to the settlement funds as early as 2007 (as Arch alleges), that assignment was still subject to the pre-existing attorney lien that took effect in 2001. An assignment " 'merely transfers the interest of the assignor,' " and the assignee " ' "stands in the shoes" ' " of the assignor. (*Johnson v. County of Fresno* (2003) 111 Cal.App.4th 1087, 1096.) Accordingly, Arch as assignee was still subject to the attorney lien. (*Brienza, supra*, 35 Cal.App.4th at p. 1850.)

In sum, we conclude that the trial court did not err in determining that Feldman had the senior priority lien.

B.    *Equitable Subrogation*

Arch argues next that, apart from its alleged assignment rights, it is also entitled to the settlement funds under the doctrine of equitable subrogation.  Equitable subrogation is defined as "the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1291 (*Fireman's Fund*).)  "In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid." (*Id.* at pp. 1291–1292.)

"The right of subrogation is purely derivative.  An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured.  The subrogated insurer is said to ' "stand in the shoes" ' of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured.  Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have." (*Fireman's Fund*, *supra*, 65 Cal.App.4th at p. 1292.)

Arch claims that it is equitably subrogated to the rights of USS Cal by virtue of its payments to USS Cal's subcontractors and suppliers on the Lafayette BART station project made from 2019 to 2021.  But as explained above, Feldman's attorney lien took effect almost two decades earlier. (*Brown*, *supra*, 116 Cal.App.4th at p. 327.)  Again, even if Arch was entitled to " ' "stand in the shoes" ' " of USS Cal when it made those payments, it would still be subject to the pre-existing attorney lien. (*Fireman's Fund*, *supra*, 65 Cal.App.4th at p. 1292.)

11

Nor has Arch satisfied the eight "essential" elements of a cause of action for equitable subrogation: (1) loss suffered by the insured for which the defendant is liable as the wrongdoer or as legally responsible for the loss caused by the wrongdoer; (2) insurer is not primarily liable for claimed loss; (3) insurer has compensated insured for the loss; (4) insurer has paid claim to protect its own interest; (5) insured has existing, assignable cause of action against defendant; (6) insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; (7) justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and (8) the insurer's damages are in a liquidated sum. (*Fireman's Fund*, *supra*, 65 Cal.App.4th at p. 1292.)

Arch makes no attempt to argue it has satisfied these elements here. Instead, Arch suggests that these elements only apply to insurers, not sureties. While there is certainly no dispute that surety bonds are different from insurance policies, courts have nonetheless applied these elements in the surety context. (See, e.g., *Gulf Ins. Co. v. TIG Ins. Co.* (2001) 86 Cal.App.4th 422, 432 [analyzing elements where entity acting as surety on performance bond alleged it was equitably subrogated to the rights of the insured].) Indeed, these elements reflect the doctrine of superior equities adopted by the California Supreme Court in *Meyers v. Bank of America Etc. Assn.* (1938) 11 Cal.2d 92 (*Meyers*). (*State Farm General Ins. Co. v. Wells Fargo Bank, N.A.* (2006) 143 Cal.App.4th 1098, 1107.) In *Meyers*, the surety on a fidelity bond reimbursed an employer after its employee forged checks and a third party bank cashed those checks. (*Meyers*, at pp. 93–94.) The Court held that the surety was not entitled to be subrogated to any claim the employer might have had against the bank. (*Id.* at p. 103.) It explained that

12

subrogation "involves a consideration of, and must necessarily depend upon the respective equities of the parties." (*Id.* at p. 102.) The surety had "paid what it contracted to pay" and "retained to its own use the premiums and benefits of such contract," while the bank was not a wrongdoer and had no reason to doubt the checks it had cashed. (*Ibid.*) The Court thus concluded: "We cannot say that as between the bank and the paid indemnitor, the bank should stand the loss." (*Id.* at p. 103.)

So too here. Arch made payments on the Lafayette BART station project pursuant to its contractual agreements with USS Cal, and presumably retained the premium paid by USS Cal. Arch has not alleged that Feldman was involved in any wrongdoing that required those payments. "The aim of equitable subrogation is to place the burden for a loss on the party ultimately liable or responsible for it and by whom it should have been discharged, and to relieve entirely the insurer or surety who indemnified the loss and who in equity was not primarily liable therefor." (*Fireman's Fund*, *supra*, 65 Cal.App.4th at p. 1296, italics omitted.) That aim is not served by shifting Arch's losses to Feldman.

C.    *Equity and Public Policy*

Finally, Arch argues that "principles of equity and public policy" afford it priority over the settlement funds. We disagree. Arch acknowledges that public policy favors attorney's liens. "If an attorney's claim for a lien on the judgment based on a contract for fees earned prior to and in the action cannot prevail over the lien of a subsequent judgment creditor, persons with meritorious claims might well be deprived of legal representation because of their inability to pay legal fees or to assure that such fees will be paid out of the sum recovered in the latest lawsuit. Such a result would be detrimental

13

not only to prospective litigants, but to their creditors as well." (*Cetenko v. United California Bank, supra*, 30 Cal.3d at pp. 535–536.)

Arch argues that an attorney lien can nonetheless be subordinated when equity and public policy "favor a different priority." While Arch cites authority for this general principle, none of those cases prioritized other recovery over a senior attorney lien. (*Waltrip v. Kimberlin* (2008) 164 Cal.App.4th 517, 531 [concluding trial court's finding that bank lien had priority over attorney lien was error]; *Brienza, supra*, 35 Cal.App.4th at p. 1848 [equities "clearly support" attorney lien priority over right of offset acquired through assignment].) We see no basis to do so here.

Nor are we persuaded by Arch's contention that its recovery of the settlement funds must be prioritized because it "serves the public policy of ensuring that sureties, like Arch, will continue to willingly issue payment and performance bonds on public projects." We doubt that such willingness rests on prioritizing surety claims over pre-existing attorney liens; sureties clearly obtain other benefits from issuing bonds, like the premium USS Cal paid to Arch here.

III.    *No Rules of Professional Conduct Violation*

Arch argues that the trial court should not have enforced Feldman's attorney lien because it violated the Rules of Professional Conduct. According to Arch, it was a former client of Feldman in other lawsuits related to USS Cal bonds.

Arch cites three Rules of Professional Conduct that it contends were violated by enforcement of Feldman's attorney lien. The first, rule 1.7, is irrelevant because it pertains to conflicts of interest with *current* (not former) clients. (Rules Prof. Conduct, rule 1.7.) The second, rule 1.8.1, prohibits a lawyer from "knowingly" acquiring an ownership, possessory, security or

14

other pecuniary interest adverse to a client, unless certain requirements have been met. (Rules Prof. Conduct, rule 1.8.1.) "An attorney's charging lien is a 'security interest' in the proceeds of the litigation." (*Fletcher v. Davis* (2004) 33 Cal.4th 61, 67, italics omitted.) Arch appears to argue that the trial court "created a security interest" when it adjudicated Feldman's attorney lien, and thus enforcement of the lien violated the rule. But as explained above, the attorney lien was created and took effect in 2001. (*Brown*, *supra*, 116 Cal.App.4th at p. 327.) Arch offers nothing to show that Feldman knowingly acquired an interest adverse to Arch at that time.

The third, rule 1.9, pertains to duties owed to former clients. It prohibits, in relevant part, representation of "another person[] in the same or a substantially related matter in which that person's[] interests are materially adverse to the interests of the former client unless the former client gives informed written consent." (Rules Prof. Conduct, rule 1.9(a).) In January 2018, Feldman wrote a letter to Arch regarding its representation of USS Cal and Arch in a separate matter. The letter stated: "If a dispute or conflict arises between USS Cal and Arch in the future, Arch also agrees that it will make no claim that our representation of Arch in this case somehow disqualifies us from continuing to represent USS Cal in this case or from representing USS Cal in any other matter, including any claim by USS Cal against Arch related to the project or projects that are the subject matter of the above-referenced lawsuit." It requested that Arch indicate its consent by return signature, which Arch did.

We are not persuaded by Arch's argument that the waiver is inapplicable here because the purported conflict arises from "Feldman's assertion of its own alleged lien for attorneys' fees against the same Settlement Funds to which Arch, its former client, is entitled." Again, it was

15

*USS Cal* that moved for a determination that its counsel had a senior priority lien and was entitled to the settlement funds.  Feldman was representing USS Cal on that motion, and Arch had waived any dispute or conflict it had with such representation.

In sum, we conclude that enforcement of Feldman's attorney lien did not constitute a violation of the Rules of Professional Conduct.

DISPOSITION

The June 15, 2023 order is affirmed.  Respondent shall recover its costs on appeal.

SIMONS, J.

WE CONCUR:


JACKSON, P.J.
CHOU, J.

*USS Cal Builders, Inc. v. Arch Insurance Company (A168102)*