Filed 9/9/14  You Never Know, LLC v. U.S. Bank Nat. Assn. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| YOU NEVER KNOW, LLC, | C065097 |
| Plaintiff, Cross-defendant and Respondent, | (Super. Ct. No. 34200800006436) |
| v. | |
| U.S. BANK NATIONAL ASSOCIATION, as Trustee, etc., et al., | |
| Defendants, Cross-complainants And Appellants; | |
| SADGUL FAZIL et al., | |
| Cross-defendants and Respondents. | |

This appeal involves cross-actions to quiet title to real property purchased at a nonjudicial foreclosure sale by a third party.  (Civ. Code, § 2920 et seq.[1])  The buyer is

---

[1]    Undesignated statutory references are to the Civil Code.

1

plaintiff and cross-defendant, You Never Know, LLC (YNK). Defendant and cross-complainant, U.S. Bank National Association, as Trustee Relating to J.P. Morgan Mortgage Acquisition Corp. 2005-FRE1 Asset Backed Pass-Through Certificates, Series 2005-FRE1, (hereafter the Bank) had a competing lien interest in the property and seeks to set aside the sale. The sale was conducted by cross-defendant California Foreclosure, on behalf of cross-defendant Sadgul Fazil, who held a deed of trust securing a loan he made to the property's former owner, cross-defendant Annie M. Hollis.

Following a bench trial, the trial court quieted title in YNK and ordered that the Bank take nothing on the cross-complaint.

The Bank appeals, arguing (1) Fazil improperly engaged in self-help, cancelling a forged reconveyance of his deed of trust, rather than obtaining judicial relief; (2) Fazil's loan to Hollis was usurious; (3) YNK was not a bona fide purchaser (BFP) and there were procedural irregularities in the sale; and (4) equitable subordination and equitable subrogation should apply. Only YNK has filed a respondent's brief.

We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 19, 2008, two days after buying the property at Fazil's nonjudicial foreclosure sale, YNK filed this quiet title action to prevent the Bank and its trustee, NDEx West, LLC, from proceeding with the Bank's pending nonjudicial foreclosure sale on the Bank's lien.

The Bank filed a cross-complaint against YNK, seeking to set aside the sale, and bringing in Hollis, Fazil, and California Foreclosure as cross-defendants. A default was entered against Hollis.

The parties stipulated to a preliminary injunction preventing sale of the property pending the outcome of this litigation.

**Trial Evidence**

On March 21, 2005, Hollis obtained a $40,000 loan from Fazil secured by a deed of trust in favor of Fazil, encumbering her home in Elk Grove. At the time, she already had a $401,098 mortgage on the property. The Fazil deed of trust was recorded. The loan agreement required monthly interest-only payments of $400, which represented a 12 percent interest rate, until maturity.

Fazil, who acted in propria persona at trial, testified the loan was arranged and prepared by one Jessie/Jesse Jackson, who worked in a real estate office. Jackson had previously assisted Fazil in buying a house unrelated to this appeal. Fazil planned to put down $100,000 on the house, but Jackson suggested he put down less and "invest" some money in a loan to Hollis, who wanted to fix up her house. Fazil would get $400 per month and then after 18 months could demand repayment of his $40,000. Unknown to Fazil, Jackson was Hollis's son. By the time of trial, Jackson had committed suicide.

On July 12, 2005, a forged "SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE" of the Fazil deed of trust was recorded, without Fazil's knowledge or consent.[2] The document purported to substitute Fazil as trustee in place of Financial Title Company, and to reconvey to Hollis the interest in the property represented by the Fazil deed of trust. At trial, a handwriting expert opined the documents were forged.

In August 2005, Hollis paid off her original mortgage through two new loans from the Bank's predecessor-in-interest, Fremont Investment & Loan (hereafter Fremont), in the amounts of $388,000 and $97,000, secured by two new deeds of trust on the property.

---

[2]    The trial court found the documents were forged and recorded by "an unknown individual," but the statement of decision noted in a footnote: "There was evidence that the person with whom Mr. Fazil dealt, Ms. Hollis'[s] son, had committed suicide, and that the notary who notarized the documents had been incarcerated in connection with similar activities." The trial court found "there was no evidence of any inequitable conduct on the part of Mr. Fazil."

Fremont obtained a title insurance policy, insuring itself as a first lienholder on the property.

In November 2006, Hollis stopped making the monthly $400 payment to Fazil. Fazil contacted Foreclosurelink to conduct a foreclosure sale, but that firm declined when it discovered the recorded reconveyance. Fazil had been unaware of the reconveyance and reported the forgery to the district attorney's office. Fazil then retained attorney and real estate broker Al Seastrand and his firm, California Foreclosure, LLC, which handles nonjudicial foreclosures.

On July 16, 2007, Fazil made California Foreclosure his trustee and recorded a "CANCELLATION OF RECONVEYANCE AND REINSTATEMENT OF DEED OF TRUST," executed by Fazil but not Hollis, stating, "a wrongfully substituted Trustee" had executed the reconveyance, which was "recorded in error," and the reconveyance was null and void, never had any force or effect, and the deed of trust and promissory note remained of the same force and effect as if the reconveyance had never been executed or recorded. Seastrand testified he did not use the word "forgery" in the cancellation, because he thought it was "too bold."

Also on July 16, 2007, California Foreclosure recorded a "NOTICE OF DEFAULT" against Hollis for $42,000. Seastrand sent the notice of default to other lien claimants.[3]

Meanwhile, in June 2007, Hollis defaulted on the Fremont loan. On October 1, 2007, Fremont recorded a notice of default and election to sell under Fremont's deed of

---

[3] The Bank says the evidence does not support the trial court's finding that the cancellation of reconveyance was sent to Hollis and Fremont. The trial court found the "recorded documents" were sent to Hollis, Fremont, and Fremont's loan servicing agent. Seastrand testified they sent the notice of default to other lien claimants, but he could not say they sent the cancellation. For purposes of this appeal, it does not matter. As the evidence made apparent, the Bank knew about the cancellation of reconveyance before the foreclosure sale.

4

trust securing the $388,000 loan. On October 25, 2007, Fremont assigned the deed of trust to the Bank.

On November 15, 2007, California Foreclosure recorded a notice of trustee's sale under the Fazil deed of trust, with the sale date scheduled for January 11, 2008. Seastrand testified the notice of sale was posted in a public place, as required by section 2924, subdivision (f), but he did not remember whether it was posted at the recorder's office or at the courthouse. When asked at trial how he could say it was posted if he did not remember where it was posted, Seastrand said, "Because we've done all the things that were required."

On November 28, 2007, Hollis filed for bankruptcy, which automatically halted any foreclosure sale. The Fazil sale was postponed several times. Seastrand testified that sales are postponed by standing at the designated place and time and announcing ("crying") the postponement and the new date. Prospective bidders would hear the announcement, but Seastrand also testified, "a lot of times we'll give the information over the phone." YNK's principals (Robert Proctor and his son Michael Proctor) phoned California Foreclosure to check on the sale date, and they were given the information over the phone.

In January 2008, Seastrand received a phone call from a representative of the Bank's trustee, NDEx, concerning the Fazil sale. Seastrand handwrote in his notes about the call, "plan to cure?" At trial, Seastrand testified his note did not document an inquiry from NDEx. NDEx did not ask about curing but just asked about the status of the case. Seastrand testified that he jotted the note as he was hanging up the phone at the conclusion of the call, and it merely reflected a question in his own mind as to what NDEx might want to do. The Bank's attorney sought to impeach with Seastrand's deposition testimony, which the attorney construed as an admission that the NDEx representative was wondering what it took to reinstate. Seastrand pointed out he qualified his deposition testimony with "I guess."

5

Seastrand testified that he also spoke by phone with Paul Engel, a claims attorney for the Bank's title insurer, Fidelity. Engel wanted proof of forgery. Seastrand testified that Fazil had tried dealing with Fidelity before hiring Seastrand, and "nothing good had come of that." In that prior dealing in April 2007, Fazil, though not an insured of Fidelity, had submitted a claim to Fidelity, asserting he did not sign reconveyance documents.

Engel testified that he tried to contact the notary public who notarized the reconveyance documents, Brenda Lee Kemp, but she was in prison. Engel obtained documents signed by Fazil and, "Just based on the eyeball comparison, the signatures did not appear to match." In June 2007, Engel wrote to Seastrand asking for proof of forgery but did not get a response.

In January 2008, the Bank submitted to Fidelity a claim on its title insurance, concerned that Fazil believed his deed of trust was senior to the interests of the Bank. Thereafter, Engel telephoned and spoke with Seastrand. The call did not go well. According to Engel, he was cordial, but Seastrand "responded contentiously. Basically, cut me off mid-sentence several times." Seastrand denied having received a letter from Engel. Seastrand eventually hung up on Engel. Engel followed up with an e-mail to Seastrand on January 16, 2008: "Now, if you would like to take the reasonable approach and act in the best interests of your client, please respond to my previous request, and provide information to substantiate your claim that the reconveyance in question is a forgery. You have no proof. Please inform me so that I can determine how to proceed."

A notation in California Foreclosure's files bore Engel's name and Seastrand's handwritten notation, "Fuck you, your momma too."

An attorney for the Bank, Ron Roup, testified he got involved in early January 2008, after NDEx came across Fazil's cancellation of reconveyance when they were in the process of foreclosing on Hollis. Before the January 2008 date scheduled for the Fazil sale, Roup phoned and asked Seastrand if he was aware of Hollis's bankruptcy and

6

the automatic stay. Seastrand confirmed he was aware and would not be proceeding with the sale. Roup testified he and Seastrand were both "kind of old school" and had a good conversation. Seastrand expressed frustration in trying to get a response from the title company. Roup told him that, typically, "the title company will address these things when you get to real estate owned, or after they've foreclosed. It's referred to as REO, if I use that term. That's very frequent . . . . [¶] But it's after they foreclose and it reverts back to them, at that time they are technically considered damaged because their title is affected. And we were factually thinking that he would have his concerns addressed when the property went back to U.S. Bank as REO property." When asked how the property would go back to the Bank, Roup testified that the Bank had filed a motion for relief from stay in Hollis's bankruptcy case. Roup and the Bank were "pretty sure" no one other than the secured creditors would bid on the property due to the uncertainty created by the cancellation of the reconveyance.

Roup testified he and Engel discussed the options, which "would range anywhere from showing up and bidding at the [Fazil] foreclosure sale; seeking a temporary restraining order due to the circumstances to estop the [Fazil] foreclosure sale; and quite frankly, in all off-the-books desperation, you could have somebody show up and do a disclaimer," i.e., announce the dispute to prospective bidders, with the goal of preventing them from being BFPs. Another option was to do nothing and rely on the title insurance. Or postpone the Fazil sale by mutual agreement and allow the Bank sale to take place or a mutual postponement. Roup testified "I still ultimately saw the issue being resolved post-foreclosure, post-U.S. Bank foreclosure, on the REO side, where they have to address this issue to clear title."

Engel wanted to prevent the Fazil sale, which would wipe out the Bank's lien. Engel said "the first option would have been [to] continue evaluation of the claim and make an effort to resolve the claim, which either would have lead [*sic*] to paying over the Fazil deed of trust, or possibly reinstating or filing a TRO." When asked at trial if he

7

would have considered sending a representative to attend the sale, Engel testified, "Yes, if it would have been necessary, we absolutely would have." When asked if one option was to go to the sale and bid for the property as a way of avoiding the loss on its $388,000 loan, Engel said, "Yes."

Roup and Engel decided that Roup would contact Seastrand, since Roup and Seastrand had better rapport. Though Roup had no independent recollection, notes indicated that on March 8, 2008, Roup phoned and left a message for Seastrand, advising that the Bank was seeking relief from the bankruptcy stay in order to proceed with its own nonjudicial foreclosure. Roup knew from checking the bankruptcy docket that Seastrand had not obtained relief from the bankruptcy stay. Seastrand did not return Roup's call. On March 7, 2008, the Bank recorded a notice of trustee's sale, scheduling its own sale for March 25, 2008.[4]

On March 12, 2008, Roup learned Hollis had been discharged in bankruptcy. Roup called California Foreclosure and spoke with Seastrand's wife, Loretta Seastrand. Roup asked whether they were postponing the foreclosure or republishing a new notice of sale. Mrs. Seastrand said she would have to have her husband get back to Roup. Mrs. Seastrand testified she would typically give callers a sale date if that was all they wanted. She did not recall talking to Roup, however.

On March 14, 2008, Hollis's bankruptcy case was closed, dissolving the stay.

On March 17, 2008, California Foreclosure conducted the foreclosure sale of the property on behalf of Fazil. Fazil submitted a credit bid of $43,000. YNK, which is in the business of buying real estate, outbid Fazil at $43,001. YNK paid $43,001 and received the trustee's deed.[5] Fazil and the trustee split the proceeds.

---

[4]    The Bank's appellate brief says the notice was recorded on February 27, 2008, but the document in the record bears a date of March 7, 2008.

[5]    The Bank valued the property at the time of sale at $433,000.

8

The notice of sale said the sale would take place at the main entrance to 2216 16th Street in Sacramento (California Foreclosure's office), and the subsequent trustee's deed said the sale took place at the main entrance. However, the sale was actually held inside California Foreclosure's office, which was just inside the building's main entrance, with the office door shut. No one was excluded. The trial court took judicial notice that the weather was neither searing hot nor pouring rain that day, though the court observed there was no prejudice shown from any irregularity in the location of the sale, because no one from the Bank went there.

On Monday, March 17, 2008, *after* the sale, Seastrand phoned Roup and told him the property was sold to a third party. Roup asked Seastrand to delay recording the trustee's deed to allow the title company to make a determination of what they needed to do. Seastrand was unsure whether he would be able to do that. Roup had no further contact with Seastrand.

Roup reported the sale to Engel. On March 18, 2008, Engel telephoned and spoke with Seastrand to inquire about the outcome of the sale. Engel testified, "Mr. Seastrand seemed to act as if he didn't know who I was and was reluctant to provide any information, but he did confirm it had gone to a third party." Engel asked for a copy of the trustee's deed. Seastrand said he did not have one, and Engel should submit any further requests in writing.

Seastrand denied delaying return calls in order to prevent the Bank from curing the default on the Fazil note.

When asked if California Foreclosure's failure to respond to the phone messages and provide notice of the actual date of the sale prejudiced the Bank, Roup did not answer the question directly. Instead, he testified, "If it extinguished the deed of trust, if the validity of the cancellation of the reconveyance would extinguish the deeds of trust, yes, it would wipe out the security of both their first and second deeds of trust."

9

YNK owner Michael Proctor testified that, before bidding, he researched the recorder's office for liens, saw the multiple liens, learned of the cancellation of reconveyance on Fazil's lien, conducted his own on-line research and contacted an attorney to determine the effect of the cancellation of reconveyance, and as a result was "pretty convinced" that Fazil's deed of trust had priority. It was YNK's business practice generally to bid only on a first lien. Proctor was able to keep track of the postponed sale dates by calling California Foreclosure's office. He was aware that there was another trustee's sale, by the Bank, pending at the time he purchased the property, and therefore YNK initiated this quiet title litigation.

Seastrand testified he thought the reattachment of the Fazil deed of trust, i.e., the cancellation of the forged reconveyance, would potentially dissuade bidders from attending the sale. Seastrand said he did not try to get Hollis to sign the cancellation. Seastrand believed the fraudulent reconveyance was ineffective to extinguish Fazil's lien, though it had the effect of telling third parties that the lien was extinguished. Seastrand was unable to obtain a trustee sale guarantee because the title company did not like the reattachment on the deed of trust.[6]

Seastrand testified he knew that the interest rate on the Fazil note was 12 percent but, as a trustee conducting a nonjudicial foreclosure, it was not Seastrand's duty to worry about usury or determine whether any usury exemption applied.

### The Trial Court's Decision

On March 1, 2010, the trial court issued a comprehensive written statement of decision quieting title in YNK and ordering that the cross-complainants take nothing.

---

[6] Over YNK's objection, the trial court allowed the Bank to present as an expert witness a lawyer specializing in foreclosures, Martin McGuinn, who opined this sale was not conducted with fairness, regularity, and scrupulous integrity, as required by law, though he acknowledged that his criticism about the failure to obtain a sale guarantee would not affect the validity of the sale. The trial court noted this was a bench trial, and the court was capable of distinguishing between proper and improper expert opinion.

The trial court stated that, as to usury, it was undisputed that the 12 percent interest rate in the loan from Fazil to Hollis was usurious, but the Bank had no standing to assert the claim of usury regarding a loan to which it was not a party.

As to the forged reconveyance, the trial court found Fazil's signature was forged on the reconveyance and substitution of trustees, and "there was no evidence of any inequitable conduct on the part of Mr. Fazil." The trial court further found the forgery rendered the reconveyance void. The court rejected the Bank's argument that Fazil was required to obtain a judicial declaration of the reconveyance's voidness before proceeding with the sale.

As to irregularities in the sale proceedings, the trial court noted section 2924[7] provides that a recital in a trustee's deed, that the trustee complied with statutory requirements of notice of sale, provides a conclusive presumption of compliance in favor of a BFP for value without notice, and a rebuttable presumption as to other buyers. Here, the trustee's deed recited, "The sale was conducted after the undersigned Trustee complied with all applicable statutory duties required, including but not limited to, mailing by certified mail, copies of all notices, and the publication and posting of the Notice of Trustee's Sale."

As the court noted, YNK argued "[BFP] without notice" means without notice of any alleged irregularities in the sale proceedings, while the Bank contended the term means without notice of any competing claimed interest in the property. Because YNK knew of the Bank's plan to conduct its own sale on its own lien, the Bank argued the

---

[7]      Section 2924, subdivision (c), provides: "A recital in the deed executed pursuant to the power of sale of compliance with all requirements of law regarding the mailing of copies of notices or the publication of a copy of the notice of default or the personal delivery of the copy of the notice of default or the posting of copies of the notice of sale or the publication of a copy thereof shall constitute prima facie evidence of compliance with these requirements and conclusive evidence thereof in favor of [BFP's] and encumbrancers for value and without notice."

11

presumption did not apply in YNK's favor. The Bank did not dispute that knowledge of a junior lien does not affect BFP status. Rather, the Bank argued that its status as a senior or junior lienholder had not been judicially established at the time of the sale.

The trial court found, "The evidence shows that plaintiff knew that the Fazil deed was recorded first, that there was a reconveyance of that deed of trust, that there were two new deeds of trust in favor of US Bank and that there was a cancellation that said the original reconveyance was null and void. The foreclosure sale was proceeding under the recorded Fazil deed. Plaintiff concluded that the Fazil deed of trust was senior." The court said the cases referred to adverse interests as prior interests, and YNK "here had no notice of an interest prior in time to the Fazil loan." Thus, the trial court found YNK was a BFP entitled to the conclusive presumption of section 2924.

The trial court also found that, assuming for the sake of argument that YNK was not entitled to the conclusive presumption of section 2924, the Bank was barred from challenging the notice of sale and other alleged irregularities, because the Bank failed to tender the amount due to pay off the Fazil lien, which is a prerequisite to such a challenge. The court rejected, as lacking evidentiary support, the Bank's claim that tender was excused by the trustee's prevention of tender. The trustee's failure to return a phone call did not give rise to a fatal defect in the proceedings.

The trial court also found that, assuming the rebuttable rather than the conclusive presumption applied, the Bank failed to meet its burden to show irregularities in the proceedings to justify setting aside the sale. The Bank claimed no public notice was posted, because Seastrand was unable to specify where and when it was posted. However, Seastrand had not been asked that question before trial, and at trial he testified he had no specific recollection, but he posted notice either at the courthouse or at the recorder's office, consistent with his custom and practice.

12

The Bank argued postponements of the sale were not properly noticed, but Seastrand testified to his practice of providing oral notice of postponements on each sale date, and the business records showed the dates of each continued sale.

The Bank argued notice of the sale location was wrong, because it said the sale would occur at the "main entrance" to the building, yet the sale was held inside. The trial court said section 2924 required nothing more.

As to alleged irregularities in the sale itself, the Bank argued they could not cure Hollis's default on the Fazil loan, because the trustee failed to provide specification of the amount in the notice of default, and the trustee failed and refused to respond to telephonic inquiries. The evidence showed the trustee did not return a phone message left on March 12, 2008, asking whether the sale was being postponed or whether a new notice of sale would be published. Mrs. Seastrand passed that type of call on to her lawyer husband. The Bank argued that even if there was no statutory duty to return phone calls, it was standard industry practice to do so. The trial court concluded there is no legal obligation for a trustee to return a particular phone call, provided the statutory steps have been followed. An ever-changing standard of industry practice would undercut the public policy for swift, efficient, and final nonjudicial foreclosure sales.

The trial court also denied the Bank's invocation of the doctrines of equitable subordination and equitable subrogation. The Bank claimed the loans it made (through its predecessor-in-interest, Fremont) replaced Hollis's original mortgage loan, which was senior to the Fazil loan, and therefore the Bank should occupy "first position" over Fazil. The trial court found the equities did not favor the Bank. There was no evidence of any inequitable conduct by Mr. Fazil. The trustee had no obligation to return the Bank's phone call, and therefore the Bank's claim that the failure to return calls was "intentional" was unavailing. The trial court further reasoned, "Nor does the Bank's conduct necessarily escape scrutiny. The testimony established that the Bank was apprised of the fact that Mr. Fazil had not reconveyed his deed of trust, and was given

13

such information as existed regarding the forgery, at a relatively early point. The Bank decided that the best way to approach the matter was to 'take the property into REO,' i.e., foreclose itself, before it dealt with Mr. Fazil's claim. Accordingly, to characterize Mr. Fazil's actions in proceeding with his foreclosure as somehow 'inequitable' would be to deny to Mr. Fazil access to the very remedy which the Bank sought to exercise on its own behalf." The trial court added that, most importantly, the rights of an innocent third party have intervened.

On March 16, 2010, the trial court entered judgment, dissolving the preliminary injunction, and finding and declaring that Fazil's deed of trust was a valid and existing lien, senior to the Bank's liens, and YNK acquired the property free and clear of the Bank's liens. The judgment quieted title in favor of YNK as the owner in fee absolute and entered judgment in favor of cross-defendants YNK, Fazil, and California Foreclosures on the Bank's cross-complaint.

## DISCUSSION

### I. Effect of Forgery

The Bank does not dispute that the reconveyance was a forgery.

"A forged reconveyance is void and of no effect; the lien of the deed of trust remains as a prior lien against any subsequent {BFP] or encumbrancer." (4 Miller & Starr, Cal. Real Estate (3d ed. 2013) § 10:146, p. 10-521, citing *Wutzke v. Bill Reid Painting Service* (1984) 151 Cal.App.3d 36 (*Wutzke*).) "[A] forged document is void *ab initio* and constitutes a nullity." (*Wutzke, supra*, 151 Cal.App.3d at p. 43.) Innocent buyers and encumbrancers can protect themselves against forgeries in the chain of title by purchasing title insurance. (*Id*. at p. 44, fn. 5.)

The Bank argues the forged reconveyance rendered nonjudicial foreclosure inappropriate. The Bank argues that, after the reconveyance and the intervening rights of good faith encumbrancer Fremont attached, Fazil and Seastrand lacked authority to conduct a nonjudicial foreclosure sale under section 2920 et seq. The Bank maintains

14

that, where a lienor claims there has been an improper reconveyance, the lienor's rights are equitable, inchoate, and subject to establishment only by a court of equity. The Bank contends Fazil was required to go to court before selling the property, obtain a judicial finding of forgery, and have the court impose an equitable lien encumbering the property for Fazil's benefit retroactive to the time of the original lien. As we will explain, the Bank fails to show that a pre-sale judicial remedy was a mandate, rather than an option.

"The enforcement of liens, whether equitable or statutory, is a well-recognized function of courts of equity; and the only distinction in this respect between the different kinds of liens is, that in the case of the latter [statutory liens] equity will interpose only where there is no other adequate remedy." (*Hibernia Sav. & Loan Soc. v. London & Lancashire Fire Ins. Co.* (1903) 138 Cal. 257, 259 (*Hibernia*).)

Without providing any analysis or authority to support the argument that the forgery stripped Fazil of his contractual and statutory lien rights, the Bank cites inapposite authority that an *equitable* lien can or must be enforced by a court of equity. For example, in *Hibernia*, cited by the Bank, property subject to a judgment lien was conveyed by the judgment debtor, Mrs. Wallace, to her daughter before Mrs. Wallace's death and therefore was not part of her estate and could not be reached in a probate proceeding, nor could an execution be issued on the judgment. (*Hibernia, supra*, 138 Cal. at pp. 258-259.) The judgment lien was a junior encumbrance. In a suit by a senior lienholder, the Supreme Court held the judgment creditor could enforce its lien by a cross-complaint, as the judgment creditor was without remedy other than by resort to a court of equity. (*Id*. at p. 258.) This case is of no help to the Bank.

In *Corporation of America v. Marks* (1937) 10 Cal.2d 218, cited by the Bank, the court held that the death of a debtor terminated the right of a judgment lien creditor to enforce his lien by execution and sale, but did not terminate the judgment lien, and the creditor could present a claim against the estate or enforce his judgment lien through an

15

equitable action to foreclose it.  (*Id*. at pp. 221-222.) This case does not advance the Bank's position here.

The Bank fails to cite any authority that the forged reconveyance left Fazil with only an equitable lien.  One of the Bank's cited treatises (44 Cal.Jur.3d, Mortgages, § 46, p. 921, miscited by the Bank as p. 861) actually undermines the Bank's position.  The treatise says:  "Although a mortgagee may, in a proper case, bring an action to set aside the release of his or her mortgage, it is not necessary to obtain a decree setting the release aside before commencing an action for foreclosure."  (44 Cal.Jur.3d, *supra*, at p. 921, citing *White v. Stevenson* (1904) 144 Cal. 104 (*White*).)

In *White*, brothers Frank and Charles Stevenson executed a promissory note and mortgage in 1890 to the plaintiff's predecessor-in-interest.  No payments were made.  When the note became due, the plaintiff in 1895 graciously gave more time but imprudently did so through the vehicle of a new note and mortgage, which was signed by Frank on his own behalf and with misrepresentation that he had power of attorney to sign for his brother.  (*Id*. at pp. 106-109.)  The plaintiff recorded a "satisfaction" and cancellation of the original mortgage.  (*Id*. at p. 107.)  When the plaintiff later sued to foreclose on the "renewed" or original mortgage, the Supreme Court held, "while the discharge of a mortgage is presumptive evidence that it has been satisfied; it is not conclusive thereof.  If it be shown that the discharge or acknowledgement of satisfaction was obtained through fraud, or was made by reason of some mistake of fact, it will be inoperative, and the mortgage may still be foreclosed. [Citations.]"  (*Id*. at p. 109.)  The Supreme Court said the trial court "should have rendered a decree for the foreclosure of the mortgage of 1890, as prayed by the plaintiff.  It was not necessary for him to obtain a decree directing a cancellation of the discharge which he had entered of record in 1895 before commencing an action for its foreclosure [citation]; nor was it necessary that a

16

formal direction for canceling the discharge should be entered by the court before rendering the decree of foreclosure."**8** (*Id*. at p. 112.)

In *Wutzke*, which did not involve a nonjudicial foreclosure, this court affirmed a judgment which declared void a forged deed of reconveyance and rendered an investor's deed of trust interest in real property formerly owned by the plaintiff subordinate to a deed of trust held by the plaintiff. (*Wutzke, supra*, 151 Cal.App.3d at pp. 38-39.) The buyers bought the property from the plaintiff and executed a promissory note to the plaintiff secured by a first deed of trust on the property. But the buyers designated as trustee an escrow company surreptitiously owned by them. (*Id*. at p. 39.) The trustee was authorized to reconvey the property only when the note was paid in full. (*Ibid*.) One of the buyers then forged fictitious signatures and recorded a deed of reconveyance which transferred unencumbered title to the buyers. An investor then invested money with the buyers in return for a promissory note secured by a first deed of trust on the property. (*Id*. at pp. 39-40.) The buyers thereafter defaulted on the promissory notes given to both the plaintiff and the investor. The trial court ordered judicial foreclosure, with the proceeds to go first to satisfy the amounts due the plaintiff. (*Ibid*.) This court affirmed, holding the forged deed of reconveyance was wholly void; a trust deed obtained by means of forgery is void; and any claim of title flowing from such a deed is void. (*Id*. at pp. 43-44.) The purported first deed of trust given to the investor was subordinate to the plaintiff's prior valid deed of trust. (*Ibid*.) The plaintiff had not acted negligently and therefore was not estopped from asserting superior title. (*Id*. at pp. 44-45.) The plaintiff

---

**8** The court in *White* also said a court of equity can restore parties whose rights have been altered by mistake, when it can be done without interfering with any new rights and without doing injustice to other persons. (*White*, *supra*, 144 Cal. at p. 110.) We recognize the Bank argues it is an innocent third party who relied upon the reconveyance. However, the Bank had title insurance and fails to show it was prejudiced.

17

was no less an innocent party than the investor, and both were the unwitting victims of an unscrupulous speculator. (*Id*. at p. 45.)

The Bank cites authority that the *recording* of a deed of reconveyance would unquestionably prevent enforcement of any power of sale in the original deed of trust. (E.g., *Ung. v. Koehler* (2005) 135 Cal.App.4th 186, 196 [discussing time limits for exercising power of sale]; *Siegel v. American Savings & Loan Assn*. (1989) 210 Cal.App.3d 953, 957 [discussing reconveyance fees], superseded by statute on other grounds as stated in *Lopez v. World Savings & Loan Assn*. (2003) 105 Cal.App.4th 729, 740.) However, none of the cited authorities dealt with a forged reconveyance. Where a conveying instrument is void due to forgery, " 'it does not gain efficacy by recordation even in favor of an alleged party taking in good faith, for value, and without notice.' " (*Wutzke, supra*, 151 Cal.App.3d at p. 44, fn. 4.)

Certainly, a judicial remedy may be available for a forged reconveyance. In fact, here we have a judicial declaration by the trial court that the reconveyance was forged. The Bank's problem is that, in order for it to prevail in this appeal, it must show that the judicial declaration had to precede the sale. The Bank fails to do so.

The Bank cites authority that judicial foreclosure may be used to resolve lien priority disputes. None of the cited authorities requires judicial foreclosure as the sole remedy for such disputes. To the contrary, one of the Bank's cited cases, *Wells Fargo Bank v. Neilsen* (2009) 178 Cal.App.4th 602, 614-615, was a case in which a trustee first proceeded with a nonjudicial foreclosure sale and then went to court for judicial determination as to how to distribute the proceeds among competing lienholders. The appellate court held the trial court correctly applied principles of judicial foreclosure law (§ 725 et seq.) to resolve the conflicting priorities as to the nonjudicial foreclosure sale. (*Wells Fargo,* at pp. 614-615.)

18

The Bank argues section 3412[9] provides a remedy for a void instrument, and where a specific remedy is provided by statute, self-help is improper. The Bank relies on *Bank of America v. Daily* (1984) 152 Cal.App.3d 767, 773 (*Bank of America*), disapproved on other grounds in *Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 999-1000, footnote 7. However, the Bank overlooks that nonjudicial foreclosure is itself a specific remedy provided by statute (§ 2920 et seq.) and is therefore not "self-help." Moreover, section 3412 says a party "may," not "must," obtain judicial relief. And *Bank of America* has no application to the instant appeal. The question there was whether the bank waived its right to judicial foreclosure on a deed of trust because the bank unilaterally set off the amount of accrued interest due on a delinquent loan secured by that deed of trust from the checking account of the debtors. (*Id*. at p. 770.) The answer was yes. (*Ibid*.)

The Bank also cites *California Golf, L.L.C. v. Cooper* (2008) 163 Cal.App.4th 1053, as mandating a pre-sale court order declaring fraud. That case does not help the Bank either. In that case, the successful bidders at a nonjudicial foreclosure sale had buyers' remorse after handing over the cashier's checks. They submitted false affidavits to the bank claiming the cashier's checks had been lost and had never been endorsed. Relying on those affidavits, the bank stopped payment and refused to honor the checks. The trial court ruled the beneficiary's only remedy was to renotice the sale and recover from the bidders the costs of the new notice of sale. (*Id*. at pp. 1062-1063.) The appellate court reversed the judgment, holding that the statutory remedy for costs to renotice a sale were not applicable and, although the statutory scheme governing nonjudicial foreclosures has been held in some circumstances to be the exclusive remedy

---

**9** Section 3412 provides: "A written instrument, in respect to which there is reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, *may*, upon his application, be so adjudged, and ordered to be delivered up or canceled." (Italics added.)

for wrongdoing in the context of nonjudicial foreclosures, the exclusivity could not be applied to immunize the fraudulent and apparently felonious conduct of the bidders. (*Id.* at pp. 1069-1072.)

The Bank cites case law in which parties sought judicial relief from forgeries. (E.g., *Clyne v. Brock* (1947) 82 Cal.App.2d 958 [in action to cancel reconveyance, evidence supported finding that testator's signature was obtained fraudulently or was a forgery]; *Merry v. Garibaldi* (1941) 48 Cal.App.2d 397 [where plaintiff/landowner whose name was forged learned of the forgery but concealed the fraud until the statute of limitations expired on defendants' right of action against bank for wrongfully honoring check given to forger, plaintiff was guilty of laches, which barred recovery in a suit to cancel the instrument]; *California Credit & Collection Corp. v. Goodin* (1926) 76 Cal.App. 785, 793-794 [it would be incompatible with a just conception of a rational system of remedial law to hold that a party drawn into a contract through fraud may not obtain judicial relief].) However, none of those cases *required* court action as a necessary prerequisite to a foreclosure sale.

The Bank says Seastrand admitted that the reconveyance had the effect of extinguishing the lien that was Fazil's deed of trust. However, this was a question of law for the trial court. Moreover, Seastrand clarified he was referring to the state of the public record. He said, "[a]ny outside or third party or interloper would see the public record and see that--what appeared to be a reconveyance done by Mr. Fazil that removed the encumbrance or liens from the property."

Furthermore, the reconveyance was not the last word on the subject, because Fazil recorded a cancellation of reconveyance.

We conclude the Bank fails to show grounds for reversal based on the forged reconveyance.

## II.  Usury

The Bank contends that a foreclosure sale is invalid in the absence of a default. The Bank argues there was no default by Hollis, because no interest can be demanded on a usurious loan and therefore the foreclosure sale was invalid.  The Bank argues the trial court erred in determining that the Bank lacked standing to assert usury in Fazil's loan to Hollis.  The trial court did not err.  The Bank does lack standing.

This issue presents a legal question, which we review de novo.  (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.)

Absent an applicable exemption, a loan with a 12 percent interest rate is unconstitutionally usurious. (Cal. Const., art. XV, § 1.[10]) Statutory remedies are provided in section 1916.12-1 et seq.

However, usury is a defense personal to the borrower.  "It is well established that 'one not a party to an usurious contract, may not, for this cause, invalidate it. . . . The

---

[10]     California Constitution, article XV, section 1, provides in part:  "The rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum but it shall be competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest:  [¶] (1) For any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum; provided, however, that any loan or forbearance of any money, goods or things in action the proceeds of which are used primarily for the purchase, construction or improvement of real property shall not be deemed to be a use primarily for personal, family or household purposes; or [¶] (2) For any loan or forbearance [etc.] . . . for any use other than specified in paragraph (1), at a rate not exceeding the higher of (a) 10 percent per annum or (b) 5 percent per annum plus the rate prevailing on the 25th day of the month preceding the earlier of (i) the date of execution of the contract to make the loan or forbearance, or (ii) the date of making the loan or forbearance established by the Federal Reserve Bank of San Francisco on advances to member banks under Sections 13 and 13a of the Federal Reserve Act as now in effect or hereafter from time to time amended (or if there is no such single determinable rate of advances, the closest counterpart of such rate as shall be designed by the Superintendent of Banks of the State of California unless some other person or agency is delegated such authority by the Legislature)."

reason is [quite] obvious.  The law of usury was made to prevent oppression, and to rescue the party oppressed; but it never was intended for the benefit of those who are not and cannot be injured by an usurious transaction.'  [Citations.]"  (*Roes v. Wong* (1999) 69 Cal.App.4th 375, 379 (*Roes*).)  "Accordingly, the usury law has not been applied for the benefit of persons other than the borrower or its representatives.  For example, one who purchases a borrower's interest in the property securing a usurious note and takes the property subject to the note cannot bring an action to recover the usurious interest paid.  [Citations.]  The rationale for this conclusion is that where one purchases the property subject to the usurious loan, the law presumes that the mortgage was considered in fixing the purchase price to be paid to the borrower, such that the usurious interest is factored in as part of the purchase price.  In this context, recognizing a claim for usury would give the purchaser a better deal than the one he made.  [Citations.]"  (*Ibid.*)

In *Roes*, a junior lienholder paid off a senior lien, at its 15 percent interest rate, to avoid foreclosure and then sued to recover treble damages for usury.  (*Roes, supra,* 69 Cal.App.4th at pp. 377-378.)  The Court of Appeal held the junior lienholder had no standing.  "[T]he holder of a junior encumbrance who pays off the senior lienholder to stave off foreclosure on the senior indebtedness may not assert a claim for usury.  [Citation.]  . . . [I]n the case of a default of a senior encumbrance, '. . . the holder of the junior encumbrance must decide whether to lose his estate in the encumbranced property or pay whatever is necessary to satisfy the holder of the senior encumbrance.  By satisfying the demands of the holder of the senior encumbrance, even though the senior loan is usurious in nature, the holder of the junior encumbrance does not have a cause of action for usury. . . .  The obvious and cogent reason for this rule of law is that the party or his personal representative asserting the claim of usury must be personally obligated on the promissory note or indebtedness.'  [Citation.]  Because the junior lienholder is not directly liable for the original loan and does not act in a representative capacity on behalf of the borrower, he does not have standing to assert usury."  (*Roes, supra*, 69 Cal.App.4th

22

at pp. 379-380, fns. omitted.) In a footnote, the *Roes* court observed that junior lienholders have successfully asserted a usury claim or defense in some published cases, but standing was not raised in those cases, and they are therefore not authority that such standing exists. (*Id*. at p. 380, fn. 4.)

In *Barnes v. Hartman* (1966) 246 Cal.App.2d 215, the court held that a plaintiff/landowner, by signing a deed of trust securing his lessees' promissory note to the defendants, was not a "borrower" entitled to sue defendants for usury. Although the landowner paid off the balance and interest due when the lessees defaulted, their note was for an improvement construction loan to which, in the lease, he had contracted to subordinate his interest in the property; he had not received proceeds from the loan or signed the note; and he had no obligation to make any repayment.

The Bank argues that *Roes* and *Barnes* merely stand for the proposition that nonparties to the loan cannot use usury as a sword to give themselves a better deal than the one they made by recovering damages for usury. The Bank argues it can use usury as a shield to protect itself from harm. The Bank quotes from *Roesch v. De Mota* (1944) 24 Cal.2d 563 (*Roesch*): "It is established law that one not a party to an usurious contract may not attack it *unless he is injured by it*." (*Id*. at p. 574, italics added.) Here, as throughout its appellate briefing, the Bank cites case law for broad propositions with no discussion of the facts of the case. The Bank merely claims that, as in *Roesch*, the Bank's "only opportunity to receive payment" on the Bank's loans is if it can exercise the power of sale of the property, and usury should be available because "[t]he preservation of the property through the defense of usury is directly to [the Bank's] benefit." (*Roesch, supra*, 24 Cal.2d at p. 574.)

There are problems with the Bank's reliance on *Roesch*. Although *Roesch* was decided after the 1934 adoption of the constitutional provision prohibiting any lender from receiving usurious compensation from a "borrower," the established law cited by *Roesch, supra*, 24 Cal.2d at page 574, for the proposition that one not a party to an

23

usurious contract may not attack it "unless he is injured by it" predated the 1934 constitutional provision. (See *Matthews v. Ormerd* (1903) 140 Cal. 578; *Zimmerman v. Boyd* (1929) 97 Cal.App. 406.)

The court in *Barnes*, observed *Matthews* and *Zimmerman* were decided before the more limited and restrictive language of the constitutional provision adopted in 1934. The *Barnes* court considered *Roesch* factually distinguishable and its "sweeping language" dictum. (*Barnes, supra*, 246 Cal.App.2d at p. 224.) Similarly, the *Roes* court said, "Admittedly, we cannot reconcile the decision in *Roesch* with the line of authorities limiting the protections of the constitutional and statutory usury provisions to borrowers or their personal representatives; in fact, we question the continuing viability of its holding in light of these other authorities. In any event, however, *Roesch* is factually distinguishable and its analysis does not establish standing on the part of a junior lienholder to assert usury." (*Roes*, *supra*, 69 Cal.App.4th at p. 380.)

Here too, assuming *Roesch* still has vitality, it is factually distinguishable. In *Roesch*, a corporation, Victor Land and Mineral Company (Victor), owned property encumbered by deeds of trust on two usurious loans. Victor entered into an agreement with one Harry Sears, for Sears to obtain an option to buy the property subject to conditions, including that Sears organize a new corporation and give shares to Victor, and that Sears pay off Victor's debts, including the (usurious) loans as well as obligations owed to judgment creditors, plaintiffs Anderson and Montreeville, though Sears was authorized to negotiate with the creditors. (*Roesch, supra,* 24 Cal.2d at pp. 566-568.) Sears set up the new corporation, Calaveras Central Mining, and assigned his rights in the option agreement to Calaveras in exchange for stock and cash. (*Id*. at p. 567.) The notes were not paid. A junior lienholder, plaintiff Roesch, foreclosed, and the property was purchased by plaintiff DeLancey. The other plaintiffs were judgment creditors of Victor and Calaveras. The plaintiffs filed suit for an accounting and to enjoin a scheduled sale

24

by a trustee, defendant Erickson, under the two usurious loans then held by defendant De Mota. (*Id*. at pp. 565-567.)

The Supreme Court in *Roesch* first held that substantial evidence supported the trial court's finding that no payments had been made on the notes. (*Id*. at pp. 568-572.) On the question of usury, the Supreme Court held that Victor and Sears had merged their holdings into the new corporate entity and retained their interest in the property and their right to assert usury. (*Id*. at pp. 572-573.) The Supreme Court also held that the plaintiffs Montreeville and Anderson, who were judgment creditors of Victor and Calaveras, could assert usury. (*Id*. at p. 574.) The judgments, which provided that payment of either should be payment *pro tanto* of the other, were obtained before execution of the deeds of trust sought to be foreclosed. The obligations were included in the list of creditors of Victor. These creditors never lost the right to look to Victor or its properties for payment. Permitting these plaintiffs to assert usury would benefit Victor. By the agreements with Sears and Calaveras, these judgment creditors were brought into privity with Victor and Calaveras, and to that extent the agreement was for the benefit of these creditors. Their only opportunity to receive payment of their judgments was from the assets of Victor or Calaveras, on which they had judgment liens. The preservation of the property through the defense of usury was directly to their benefit. The *Roesch* court accordingly held that the judgment creditors could assert usury under the principle that a person injured by a usurious contract may attack it. (*Ibid*.)

Here, the Bank argues it suffered injury similar to the lienors in *Roesch*, because the Bank's only opportunity to receive payment on the loans it made was to exercise a power of sale of the property. However, the Bank could have exercised this power by paying off the Fazil deed of trust and adding that amount to the amount owed to the Bank

25

(§§ 2904,[11] 2876[12]) or by looking to the Bank's title insurer for reimbursement, in which case the Bank would have suffered no injury. The evidence shows the Bank knew it had options. Roup, the Bank's attorney, testified he and the Bank's title insurance representative, Engel, discussed the options, which included showing up and bidding at the Fazil foreclosure sale, seeking a temporary restraining order to estop the Fazil foreclosure sale, and "do nothing" and rely on the title insurance.

We conclude the Bank lacked standing to assert usury.

### III. BFP / Failure to Tender

The Bank argues the trial court erred in concluding that YNK was a BFP and was therefore entitled to the conclusive presumption of section 2924, subdivision (c) (see fn. 7, *ante*) that the sale was procedurally proper. The parties dispute the meaning of BFP in the context of section 2924. The Bank argues BFP means someone who has no notice of any adverse interest in the property. YNK argues BFP under section 2924 means someone who has no notice of the alleged irregularities in the sale proceedings. We need not resolve this dispute, because it does not matter in this case. As we will explain, even assuming for the sake of argument that YNK was not a BFP, the Bank fails to show grounds for reversal because it has not shown it tendered payment on the Fazil lien.

"[B]efore a junior lienor may set aside a nonjudicial foreclosure of real property under a deed of trust because of irregularities in the sale, the junior lienor must first

---

**11**    Section 2904 states: "One who has a lien inferior to another, upon the same property, has a right: [¶] 1. To redeem the property in the same manner as its owner might, from the superior lien; and, [¶] 2. To be subrogated to all the benefits of the superior lien, when necessary for the protection of his interests, upon satisfying the claim secured thereby."

**12**    Section 2876 says, "Where the holder of a special lien is compelled to satisfy a prior lien for his own protection, he may enforce payment of the amount so paid by him, as a part of the claim for which his own lien exists."

tender the full amount owing on the senior obligation." (*Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 577 (*Arnolds*).) As we have explained, the forged reconveyance did not deprive Fazil's lien of senior status.

"[T]he statutory scheme concerning nonjudicial foreclosures contemplates that in order to protect his interest, the junior lienor shall pay the trustor's obligation to the senior lienor. Thus, Civil Code section 2904 permits a junior lienor to redeem a property from the senior lienor and to be subrogated to all benefits of the superior lien. Civil Code section 2876 permits a junior lienor to add the amount of the senior lien he has satisfied to the amount owed him. Civil Code section 2924c, subdivision (a)(1) permits a junior lienor to cure a trustor's default within [specified time limits before the sale]. . . . [B]ased upon this statutory scheme and the equitable maxim [that a court of equity will not order that a useless act be performed], a junior lienor must allege tender of the senior obligation as an essential element of any causes of action based upon irregularities in the sale procedure. To hold otherwise would permit [parties] to state a cause of action without the necessary element of damage to themselves." (*Arnolds, supra*, 158 Cal.App.3d at pp. 579-580, fns. omitted.)

" 'A tender is an offer of performance made with the intent to extinguish the obligation. (Civ. Code, § 1485.[13])' [Citation.] A tender must be one of full performance (Civ. Code, § 1486[14]) and must be unconditional to be valid. (Civ. Code, § 1494[15] . . . .)" (*Arnolds, supra*, 158 Cal.App.3d at p. 580.)

---

**13** Section 1485 provides: "An obligation is extinguished by an offer of performance, made in conformity to the rules herein prescribed, and with intent to extinguish the obligation."

**14** Section 1486 says, "An offer of partial performance is of no effect."

**15** Section 1494 states, "An offer of performance must be free from any conditions which the creditor is not bound, on his part, to perform."

27

This issue presents factual questions, which we review for substantial evidence. (*Winograd v. American Broadcasting Co*. (1998) 68 Cal.App.4th 624, 632.)

Here, the Bank did not try to pay off Hollis's debt to Fazil.

The Bank argues tender is excused because, in order to tender, they would have to know exactly how much to tender, yet Seastrand refused to return the telephone inquiries made by the Bank, which prevented Roup and the Bank from being able to make a valid tender. However, the Bank's argument is disingenuous, because there is no evidence that the Bank ever made inquiries about the exact amount or ever communicated a desire to tender payment on the Fazil lien, orally or in writing. The Bank's phone calls and messages to California Foreclosure were for other reasons. The Bank's trustee, NDEx, phoned to inquire about the status of the case. Seastrand handwrote in his notes "plan to cure?" not because of an inquiry by NDEx, but rather as Seastrand's own musing as to what the Bank might do. That this was a question in Seastrand's own mind is corroborated by his use of a question mark. It is further corroborated by the lack of any written communication to Seastrand from the Bank indicating a desire to tender or a question about what it would take to do so. And no witness associated with the Bank testified about any such inquiry.

Engel, on behalf of the Bank's title insurer, phoned Seastrand, not to inquire about tender, but to demand proof of the forgery, as reflected in Engel's follow-up e-mail: "Now, if you would like to take the reasonable approach and act in the best interests of your client, please respond to my previous request, and provide information to substantiate your claim that the reconveyance in question is a forgery. *You have no proof.* Please inform me so that I can determine how to proceed." (Italics added.) Roup, the Bank's attorney, phoned to make sure Seastrand was aware of Hollis's bankruptcy and the automatic stay. In fact, Roup expressed the Bank's intent, not to tender performance on the Fazil debt, but to beat Fazil to the auction block. As we have noted, Roup testified, "the title company will address these things when you get to real estate

owned, or after they've foreclosed. It's referred to as REO, if I use that term [*sic*]. That's very frequent . . . . [¶] But it's after they foreclose and it reverts back to them, at that time they are technically considered damaged because their title is affected. And we were factually thinking that he would have his concerns addressed when the property went back to U.S. Bank as REO property." When asked how the property would go back to the Bank, Roup testified that the Bank had filed a motion for relief from stay in Hollis's bankruptcy case. Roup and the Bank were "pretty sure" no one other than the secured creditors would bid on the property due to the uncertainty created by the cancellation of the reconveyance.

Roup testified he and Engel discussed the options, which "would range anywhere from showing up and bidding at the [Fazil] foreclosure sale; seeking a temporary restraining order due to the circumstances to estop the foreclosure sale; and quite frankly, in all off-the-books desperation, you could have somebody show up and do a disclaimer," i.e., announce the dispute to prospective bidders, with the goal of preventing them from being BFP's. Another option was to do nothing and rely on the title insurance. Or postpone the Fazil sale by mutual agreement and allow the Bank sale to take place or a mutual postponement. Roup testified "I still ultimately saw the issue being resolved post-foreclosure, post-U.S. Bank foreclosure, on the REO side, where they have to address this issue to clear title."

Engel wanted to prevent the Fazil sale, which would wipe out the Bank's lien. Engel said "the first option would have been [to] continue evaluation of the claim and make an effort to resolve the claim, which either would have lead [*sic*] to paying over the Fazil deed of trust, or possibly reinstating or filing a TRO." When asked at trial if he would have considered sending a representative to attend the sale, Engel testified, "Yes, if it would have been necessary, we absolutely would have." When asked if one option was to go to the sale and bid for the property as a way of avoiding the loss on its $388,000 loan, Engel said, "Yes."

29

On March 8, 2008, Roup left a phone message for Seastrand, advising that the Bank was seeking relief from the bankruptcy stay in order to proceed with its foreclosure. On March 12, 2008, Roup called California Foreclosure, spoke with Seastrand's wife, and asked whether California Foreclosure was postponing the foreclosure or republishing a new notice of sale.

The evidence shows the Bank considered a lot of options, but the Bank never conveyed to California Foreclosure any interest in curing the default by tendering payment on Hollis's debt to Fazil.

We conclude tender was not excused, and the Bank's failure to tender payment on the Fazil debt prevents the Bank from challenging any asserted irregularities in the sale.[16]

## IV. Equitable Subordination/Subrogation

In an apparent attempt to make an end run around the tender problem, the Bank argues the trial court erred in denying application of the doctrines of equitable subordination and equitable subrogation. Though the Bank invokes a substantial evidence standard of review, trial courts have discretion in ruling on these equitable doctrines, and our review is for abuse of discretion. (*Dieden v. Schmidt* (2002) 104 Cal.App.4th 645, 654.) We conclude the Bank fails to show abuse of discretion.

### A. Equitable Subordination

The Bank cites *Del Conte Masonry Co. v. Lewis* (1971) 16 Cal.App.3d 678, 681 (*Del Conte Masonry*), for the proposition that equitable subordination is a remedy available when there are questions about priority of an *equitable lien*. However, the court in that case said that where successive conflicting interests, purely equitable in nature, are in all other respects equal, the equity prior in time prevails. (*Ibid.*) " 'Interests are equal in equity when each is entitled to the same recognition and protection by reason of possessing to an equal degree those elements of right and justice which are recognized

---

**16**     Thus, we need not address the Bank's claims of irregularities.

30

and aided by the courts of equity.' " (*Ibid*.)  The *Del Conte Masonry* court held that, although a plaintiff who prevailed in a civil case gave his lawyer a lien against the anticipated money judgment before the plaintiff's creditor obtained a court order granting him a lien on the judgment, the trial court properly gave priority to the creditor, who was the first to assert his claim.  (*Id*. at pp. 680-681.)

Here, Fazil was the first to assert his claim by proceeding with the foreclosure sale, and the Bank fails to discuss how *Del Conte Masonry* supports the Bank's position in this appeal.

The Bank asserts that bankruptcy courts have developed a three-part test to determine whether to apply equitable subordination: (1) The lien claimant whose lien is to be subordinated must have engaged in inequitable conduct; (2) the misconduct must have injured other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination must be consistent with bankruptcy law.  The Bank offers no analysis, other than to cite bankruptcy cases for the proposition that the doctrine applies when a creditor defrauds other creditors.  However, the Bank cites no evidence of fraud or inequitable conduct by the lien claimant, Fazil.

The Bank argues the trial court's finding that "there was no evidence of any inequitable conduct on the part of Mr. Fazil" is wrong.  The Bank acknowledges this presents a factual question subject to review under a substantial evidence standard. (*Winograd v. American Broadcasting Co., supra*, 68 Cal.App.4th at p. 632.)  Yet the Bank forfeits substantial evidence review by failing to acknowledge, in its subordination/subrogation argument, the evidence favorable to the trial court's finding (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881), e.g., Fazil was a victim of Hollis's son, who committed suicide, and a notary public who landed in prison for similar fraud against others.  The Bank cites no evidence of misconduct by Fazil.  Instead, the Bank claims that *Seastrand*'s notation in his own files next to Engel's name--"Fuck you, your momma too"--is evidence of inequitable conduct by Fazil.  However, the comment

31

was written by Seastrand, not Fazil.  Contrary to the Bank's assertion that Seastrand wrote this note "to" Engel, it was a note in Seastrand's own files.  Also, contrary to the Bank's claim that the note showed animus against the Bank's interests, it showed at most a personal animus by Seastrand against Engel, who was employed by Fidelity and who apparently flatly rejected the fact that the reconveyance had been forged.  Seastrand showed no such animus against Roup, who was the Bank's attorney and with whom Seastrand had a pleasant conversation.

The Bank argues Seastrand, as Fazil's agent, engaged in inequitable conduct by failing to provide the Bank with the postponed sale dates.  However, the Bank cites no statute requiring Seastrand to return the Bank's calls, particularly after the Bank was uncooperative in assessing Fazil's claim of forgery.  The Bank knew of the original sale date and could have sent a runner to get the new date.  As we have indicated, the Bank complains Seastrand did *not* testify that each postponement was publicly declared ("cried") at the time and place scheduled for the sale, as required by section 2924g.  However, Seastrand did testify to his custom and practice of doing so.  "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom."  (Evid. Code, § 1105.)

Additionally, the Bank ignores the trial court's consideration of the Bank's own conduct.  The trial court said:  "Nor does the Bank's conduct necessarily escape scrutiny.  The testimony established that the Bank was apprised of the fact that Mr. Fazil had not reconveyed his deed of trust, and was given such information as existed regarding the forgery, at a relatively early point.  The Bank decided that the best way to approach the matter was to 'take the property into REO,' i.e., foreclose itself, before it dealt with Mr. Fazil's claim.  Accordingly, to characterize Mr. Fazil's actions in proceeding with his foreclosure as somehow 'inequitable' would be to deny to Mr. Fazil access to the very remedy which the Bank sought to exercise on its own behalf."  The trial court added that, most importantly, the rights of an innocent third party (YNK) have intervened.

32

The Bank is not entitled to equitable subordination.

## B. Equitable Subrogation[17]

Equitable subrogation is the right to recover from the debtor-obligor when the subrogee pays the debtor's obligation to a creditor in order to protect the subrogee's own interest. (13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 183, pp. 514-515, and cases cited therein.) Subrogation cannot be asserted against a third party unless the third party is guilty of some wrongful conduct that makes his equity inferior to that of the plaintiff. (Id., § 187, at p. 521, and cases cited therein.)

Here, the Bank fails to show its predecessor, Fremont, gave Hollis the loans with which she paid off the original mortgage, in order to protect Fremont's own interest. The Bank also fails to show any misconduct by YNK.

The Bank says section 2904 (see fn. 11, *ante*) allows it to redeem property from a superior lien. The Bank contends its predecessor, Fremont, refinanced Hollis's mortgage, allowing Hollis to pay off the original mortgage, which had priority over Fazil's deed of trust. The Bank says the refinancing "elevated" Fazil from a junior to a "purported" senior lienholder, and Fazil is now in a position to assert that his equitable lien is senior to the Bank's lien only because the Bank's predecessor refinanced Hollis's debt at a time when it appeared that the Fazil deed of trust had been reconveyed.

If the Bank is claiming that, by its predecessor's providing refinancing, the Bank should be allowed to step into the shoes of the original lender as senior lienholder, the Bank cites no supporting authority. The Bank cites *Stein v. Simpson* (1951) 37 Cal.2d 79, in which the court held that a junior lienholder who paid a debt secured by a senior lien,

---

**17** The Bank faults the trial court for making only "passing references" to subrogation without analysis. In a footnote, the Bank says a trial court's failure to make findings on material issues may be reversible error. Since the Bank does not present this claimed deficiency under a separate heading as a discrete contention, we disregard it. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19; Cal. Rules of Court, rule 8.204(a)(1) [appellate brief must state each point under a separate heading or subheading].)

in order to protect the junior lienholder's interest, became subrogated to the rights of the senior lienholder as against the property owner who defaulted on the senior debt, although the junior lienholder took no assignment of the senior lien.  Here, Fremont was not protecting its own interest in the property, because it had none, when it agreed to loan money to Hollis.

The Bank fails to show any abuse of discretion in the trial court's denial of an equitable remedy.

We conclude the Bank fails to show grounds for reversal.

## DISPOSITION

The judgment is affirmed.  Plaintiff and cross-defendant YNK shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1)-(2).)


        MURRAY        , J.


We concur:


        BLEASE        , Acting P. J.


        ROBIE        , J.